546 A.2d 1101

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Donald HARDCASTLE, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 9, 1987.

Decided Aug. 10, 1988.

240

William A. Fitzpatrick, Philadelphia, for appellant.

Ronald Eisenberg, Chief, Appeals Div., Gaele McLaughlin Barthold, Deputy Dist. Atty., Harriet R. Brumberg, Philadelphia, Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

Appellant, Donald Hardcastle, appeals from the judgment of sentence of death imposed by the Court of Common Pleas of Philadelphia.

The basic facts of this case are as follows. On May 23, 1982, Joseph Gregg, age 60, and Ernestine Dennis, age 57, were found dead in Mr. Gregg's home at 2122 West Stewart Street in Philadelphia. Joseph Gregg had been stabbed thirty-three times, Ernestine Dennis had been stabbed thirty-four times, and Joseph Gregg's house had been set on fire. Testimony of several neighbors placed appellant, Donald Hardcastle, at or near the scene at the time of the stabbings and fire. A warrant was issued for appellant's arrest and on May 25, 1982, Donald Hardcastle surrendered to the Philadelphia Police.

Appellant was charged by information with arson, burglary, and two counts of murder. Appellant was tried and a jury convicted him of two counts of murder in the first degree; two counts of arson, i.e., arson related to the person, and arson related to the structured property; and burglary.

Appellant filed post-trial motions. A court *en banc* granted appellant's motion for a new trial ruling that appellant was deprived of a jury truly representative of the community resulting from the Commonwealth's impermissible use of peremptory challenges. The Commonwealth appealed and the Superior Court reversed the decision of the trial court, holding that under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *reh. denied*, 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965), appellant had not made out his case. Appellant filed a petition for allowance of appeal, we granted allocatur and, after consideration of the parties briefs and oral arguments, dismissed the appeal as having been improvidently granted.

The case was remanded to the trial court for sentencing. Appellant received the following sentence: death for the

242

murder of Joseph Gregg; death for the murder of Ernestine Dennis; 2½ to 5 years for arson; 2½ to 5 years for burglary. Appellant appeals from the judgments of sentence, raising several issues for our consideration.

■ Appellant first contends that the Commonwealth improperly used its peremptory challenges, thereby depriving him of a jury representative of the community. The Commonwealth had twenty peremptory challenges available and exercised twelve challenges against twelve of the fourteen black persons interviewed. Appellant contends that the Commonwealth's use of peremptory challenges was violative of his constitutional rights.

The peremptory challenge is deeply rooted in the common law. It is, as Blackstone has stated, "an arbitrary and capricious species of challenge; a provision full of that tenderness and humanity to prisoners for which English laws are justly famous." 4 W. Blackstone Commentaries 353. The peremptory challenge was adopted by the colonies, who made it available to both the defense and prosecution, and it then became ingrained in our legal process.

The peremptory challenge was exercised free of judicial review until the United States Supreme Court decided *Swain, supra.* *Swain* applied equal protection standards to the prosecutor's use of the challenge, but placed the burden on a defendant to prove that the prosecutor systematically and consistently excluded a racial group from jury selection. *Id.* 380 U.S. at 233, 85 S.Ct. at 842–843.

The *Swain* standard was widely criticized as inadequate, and several jurisdictions went beyond *Swain* and granted a defendant further protections based on state constitutional grounds.[1] Ultimately, in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) the United States Supreme Court reconsidered *Swain,* and overruled it.

1. *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); *Riley v. State,* 496 A.2d 997 (Del.1985), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); *State v. Neil,* 457 So.2d 481 (Fla.1984); *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499 (1979), *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979).

In its stead the U.S. Supreme Court held that a defendant need only show that the prosecution improperly exercised its peremptory challenges in each specific case. However, *Batson,* placed the burden on the defendant to make a prima. facie showing that:

1) he is a member of a cognizable racial group; and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race;

2) the peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate; and

3) the facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude· the veniremen from the petit jury on account their race.

Once the defendant meets this burden the state must come forward with a neutral explanation for challenging minority jurors. The court emphasized that:

the prosecutors explanation need not rise to the level justifying exercise of a challenge for cause (citations omitted) [b]ut the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendants race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race.

*Id.* 476 U.S. at 97, 106 S.Ct. at 1723. The Court further stated that "[i]n deciding whether the defendant has made the requisite showing, the *trial couᵣt* should consider all relevant circumstances" *id.* 476 U.S. at 96, 106 S.Ct. at 1722–1723. (emphasis added).[2]

The case before us presents a difficult problem for review. Since the Supreme Court's decision in *Batson* postdates appellant's judgment of sentence, the defense did not object to the prosecutor's use of peremptory challenges at

2. Other state courts and commentaries have stated how *Batson* should be interpreted procedurally. *See: Ex Parte Branch;* [Ms. 86–500, September 18, 1987] 526 So.2d 609, (Ala.1987). See also, Note, *Batson v. Kentucky:* The New and Improved Peremptory Challenge, 38 Hastings L.J. 1195 (1987).

the time of voir dire, the prosecution did not rebut the objection, and the trial court did not rule on the issue. Defense counsel did, however, preserve the issue by making a motion for a mistrial, subsequent to voir dire and prior to trial, based on the prosecutor's impermissible use . of the challenges.[3] Because the issue was preserved appellant is entitled to the protections granted by *Batson. See Commonwealth v. Cabeza*, 503 Pa. 228, 469 A.2d 146 (1983). Therefore, we must make a *post hoc* evaluation of the record, examining each of the Commonwealth's fourteen peremptory challenges to determine whether appellant has made out a prima facie case of improper use.

The first challenged juror, when questioned by the Commonwealth, indicated that a member of his family had been the victim of violent crime. His sister had been raped approximately six or seven years prior to appellant's trial.

The second challenged juror, when questioned by the defense, indicated that she heard about the underlying case through the media at the time of the killings.

The third challenged juror was questioned at length by the Commonwealth and defense. Her testimony indicated that she worked for the Commonwealth of Pennsylvania for twenty-five years, taking care of delinquent children. She further testified to her educational background and family history. The questioning gave the Commonwealth attorney ample opportunity to observe responses and demeanor.

The fourth challenged juror testified that her sister and nephew had both been arrested on drug related charges. Her sister went to trial on the charges. Furthermore, her father had been the victim of a crime.

The fifth challenged juror initially testified that she would not follow the judge's instructions if she felt that something else was better law; although after further questioning she did indicate that she would follow the law as defined by the judge.

**3.** The Honorable Edwin S. Malmed, who conducted voir dire, became ill. The new trial judge, the Honorable George J. Ivins denied the motion since no legal support for it was offered. .

The sixth challenged juror testified that her brother went to jail for robbery four years ago and that she attended her brother's trial.

The seventh challenged juror testified that he was a case-worker for the Commonwealth of Pennsylvania, and that his brother was killed as the victim of violent crime.

The eighth challenged juror testified that she was a registered nurse, that she had six children, and that her son was previously convicted of rape.

The ninth challenged juror testified that she was twenty years old, a high school graduate, and unemployed. She resided with her mother and had never served on a jury prior to this case.

The tenth challenged juror testified that he was a thirty-five year old single bartender living in south Philadelphia. When asked if there was a reason whether he could not return a verdict of death, even in a proper case, the juror stated "No ..., I wouldn't go against my word, you know, whatever I thought was right." He then changed his testimony indicating that he would follow the law as defined by the judge.

A review of this record indicates that an identifiable reasonable basis for a challenge was available in at least ten of the Commonwealth's twelve peremptory challenges. In the other two instances the Commonwealth had the opportunity to observe the witnesses and their response to questioning prior to exercising the peremptory challenge. In addition, although the Commonwealth had ample challenges remaining, there were no challenges offered to two black jurors, one of whom ironically was challenged by the defendant.

On this record we find that appellant has not made out a *prima facie* case of the Commonwealth's improper use of peremptory challenges.

Appellant next contends that the verdict is against the weight of the evidence. Along with this argument appellant contends that the trial court improperly overruled his

demurrer and improperly denied his motion for a directed verdict. Appellant also alleges that the trial court erred in allowing the jury to consider whether there were aggravating circumstances present in this case. All of appellant's arguments depend on the resolution of one issue: whether the evidence presented was sufficient to sustain appellant's convictions.

█ The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt. *Commonwealth v. Syre,* 507 Pa. 299, 489 A.2d 1340 (1985). This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. *Commonwealth v. Sullivan,* 472 Pa. 129, 150, 371 A.2d 468, 478 (1977); *Commonwealth v. Farquharson,* 467 Pa. 50, 354 A.2d 545 (1976); *Commonwealth v. Cox,* 466 Pa. 582, 353 A.2d 844 (1976).

Turning to the evidence in this case, Flavia Cherry, then a neighbor of the victims, testified that in the late evening of May 22, 1982 and early morning of May 23, 1982, she was in her home at 2134 West Stewart Street with the front door open. She heard her mother, who was walking home at the time, telling someone to "leave the car alone". The witness looked outside and saw the appellant standing next to the victim's (Joseph Gregg's) car which was parked in front of Mr. Gregg's home. The appellant was trying to open the hood of the car with a crowbar. The witness described Donald Hardcastle as wearing a tan sweater or jacket, light colored T-shirt, dark pants or jeans, and white sneakers. She described appellant's hair as "processed ... with a lot of grease in it."

After observing appellant tampering with Joseph Gregg's car, the witness' mother knocked on the door of Mr.

Gregg's 2122 West Stewart Street home, but no one responded. Both the front door and screen door were closed and locked at the time. Ms. Cherry's mother returned home and called the police. The appellant then left the scene by way of a vacant lot situated between the witness' and victim's homes. At approximately 1:00 a.m. Ms. Cherry heard a door slam. She looked outside and saw that appellant had returned and was in Joseph Gregg's car just sitting behind the wheel.

At approximately 1:45 a.m. a neighbor knocked on Ms. Cherry's door and informed her that Joseph Gregg's house was on fire. Ms. Cherry and another neighbor, William Mack, went to the burning house and, finding the front door and screen door open, went inside. They extinguished a small fire on the first floor, but were unable to reach the second floor due to intense flames. William Mack also testified that when he and Ms. Cherry arrived at Joseph Gregg's home both doors were open and the lights were out.

James Mack, the brother of William Mack, testified that May 23, 1982, at approximately 1:00 a.m., he was returning home from work. He was walking west on Stewart Street towards his home when he observed appellant coming out of Joseph Gregg's automobile. The appellant was dressed in a light shirt, dark pants and sneakers. As James Mack passed the car, the appellant said to him "what's up James?" James Mack testified that he had lived in that neighborhood for twenty-one years and that he knew the appellant for as long "as he could remember."

According to Mr. Mack appellant proceeded to the door of Joseph Gregg's home. James Mack noticed that the front door was open and there were no lights on in the house. Mr. Mack went to his home and remained there for five or ten minutes. He then proceeded to a restaurant to get something to eat. He was returning from the restaurant approximately ten minutes later when he observed the appellant walking from the direction of Joseph Gregg's house, across the street to Mr. Gregg's car. Appellant then

got out of the car and walked back towards Joseph Gregg's house. James Mack last observed appellant on the front porch of the house. He also observed that the front door was still open. James Mack returned home and approximately five minutes later he was informed that Joseph Gregg's house was on fire.

Jeannette High also testified for the Commonwealth. Ms. High was returning home from an evening at the "motorcycle club" on May 23, 1982, at approximately 1:30 a.m. She was walking on Stewart Street with her sister when she noticed smoke coming out of a window in Joseph Gregg's home. She then observed someone running out of the home. Ms. High described the person as a young black man, approximately 18 or 19 years old about 5'10" tall with short black hair. He was wearing a light colored jacket, dark pants and white sneakers. He was carrying a box, and he ran around the side of the house, through a vacant lot towards the basketball court behind the house. Jeannette High was unable to positively identify the man because when he exited the house, the door opened towards her, obstructing her view. She was therefore only able to get a side view of the person.

Anthony Evans next testified for the Commonwealth. Mr. Evans resided at 2145 Sharswood Street, which is one block south of Stewart Street. On May 23, 1982, at approximately 1:45 a.m., Mr. Evans was playing cards in his home. At the end of the game he went to the door for some air. He observed someone stumbling through the vacant lot next to Joseph Gregg's house coming from the direction of Stewart Street towards Sharswood Street. He identified the person as appellant, whom the witness had known for approximately two years. Appellant was wearing a light shirt and dark pants and was wearing his hair "slicked" and was carrying a box which he dropped in the lot. The witness noticed that appellant was picking up Schaeffer beer bottles, as well as wine and vodka bottles, and placing them back in the box. Appellant offered Mr. Evans a beer. Mr. Evans declined and went back into his home. Approxi-

mately five minutes later Mr. Evans went to the store three blocks from his home. He remained there for approximately seven minutes and while returning home, smelled smoke and saw fire equipment at Joseph Gregg's home.

Lieutenant Thomas D. Schneiders of the Philadelphia Fire Marshal's office also testified for the Commonwealth. Lieutenant Schneiders investigated the fire in Joseph Gregg's house. In his opinion the front doors to Mr. Gregg's home were forced open, but not in a way in which the fire department would have made entry. The screen in the screen door was recently ripped and the splintered and fractured door jamb was characteristic of an outside force being exerted against the door.

Inside the house the living room curtains were burned as a result of someone holding an open-flame device such as a cigarette lighter or a pack of matches under them. The room was in a state of disarray uncharacteristic of the actions of the fire department. The kitchen was also in a state of disarray with drawers removed from the cabinets, and liquor bottles strewn about the room. Red stains were also found on the cabinets. Although the firemen had been in the kitchen, the mess was not consistent with the firemen's usual conduct.

The second floor of the house was badly damaged by fire. In Lieutenant Schneider's opinion the fire was intentionally started using an open-flame device to ignite clothing piled in the front bedroom. Two badly burned bodies, later identified as Joseph Gregg and Ernestine Dennis, were found in the bedroom. In the lieutenant's opinion there were three fires, each independent of the other. The bedroom fire was the first one started and it began at approximately 1:45 a.m., give or take five or ten minutes.

The two bodies found in the front bedroom were badly slashed. Joseph Gregg was stabbed thirty-three times, with the wounds varying in direction and severity. He died as a result of his stab wounds. Ernestine Dennis was stabbed thirty-four times. Her wounds varied, and she also died as a result of them. Both deaths occurred at or about

the same time. A serrated kitchen knife stained with blood was found in the debris near the bodies. A large machete type knife was also found on the premises. The majority of the wounds on the bodies were consistent with the serrated knife. The rest of the wounds were consistent with the machete.

Dwight Gregg, the son of the victim Joseph Gregg, had visited his father on May 22, 1982, and brought him several cases of Schaeffer beer. While he was putting away the beer he observed four boxes, or liquor cartons, in the cellar stairs of his father's home. He also observed the bottle of vodka from which his father had been drinking that night. When Dwight Gregg left his father's home at 8:00 that evening the doors were intact, and his father and Ernestine Dennis were preparing for bed. That was the last time he saw them alive.

■ Murder is an unlawful killing of another with malice aforethought, express or implied. *Commonwealth v. Bowden,* 456 Pa. 278, 309 A.2d 714 (1973). Furthermore, malice may be shown in a murder prosecution by proving that a defendant used a dangerous weapon on a vital part of another's body. *Commonwealth v. Clark,* 270 Pa.Super. 441, 411 A.2d 800 (1979), *cert. denied,* 446 U.S. 944, 100 S.Ct. 2170, 64 L.Ed.2d 799 (1980).

■ There is no requirement that a homicide, including murder in the first degree, be proven by eyewitness testimony. Circumstantial evidence may be sufficient to prove any element, or all of the elements of the crime. *Commonwealth v. Crowson,* 488 Pa. 537, 542, 412 A.2d 1363, 1365 (1980); *Commonwealth v. Amato,* 449 Pa. 592, 297 A.2d 462 (1972); *Commonwealth v. Chester,* 410 Pa. 45, 188 A.2d 323 (1963). Furthermore, "[a]lthough no single bit of evidence may conclusively establish guilt, the verdict will be sustained where the totality of the evidence supports the finding of guilt." *Crowson, supra* 488 Pa. at 543, 412 A.2d at 1365. *See Commonwealth v. Dawson,* 464 Pa. 254, 346 A.2d 545 (1975).

■ It is undisputed that a homicide occurred in this case. The victims were found in their home, each sustaining numerous stab wounds. The unequivocal testimony of the medical examiner establishes that the victims died as a result of the stab wounds. The medical examiner testified that the victims had been dead only a short while before they were found. Joseph Gregg's son testified that his father had been in good health when he left him at approximately 8:00 p.m. on May 22, 1982. The murders had to occur sometime between 8:00 p.m. and the time of the fire.

When appellant was first seen by Flavia Cherry at Joseph Gregg's automobile, the doors to Mr. Gregg's house were shut and locked. Appellant was next seen on the victim's front porch. This time the door was open. A short while later a man matching appellant's description was seen running out of the victim's house. It was at this time that the fire was discovered. The man was carrying a box and ran through the vacant lot next to the victim's home. Approximately the same time a witness observed appellant stumbling out of the rear of the same vacant lot. Appellant was carrying a carton box filled with liquor and beer. Based on the cumulative effect of this evidence a jury could find, beyond a reasonable doubt, that appellant was guilty of two counts of first degree murder.[4]

■ Appellant also challenges his convictions for arson endangering persons and arson endangering property.[5] In

---

**4.** 18 P.S. § 2502(a) provides that: "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."

**5.** 18 P.S. § 3301(a)(1) provides in relevant part that:
A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, ... and if:
(i) he thereby recklessly places another person in danger of death or bodily injury, including, but not limited to a firefighter, police officer or other person actively engaged in fighting the fire; or,
(ii) he commits the act with the purpose of destroying or damaging an inhabitated building or occupied structure of another.
18 P.S. § 3301(c) provides in relevant part that:
A person commits a felony of the second degree if he intentionally starts a fire or causes an explosion, whether on his own property or that of another ... and if:

order to convict a person of arson, the prosecution must establish beyond a reasonable doubt that (1) there was a fire, (2) it was maliciously set, and (3) the defendant was the guilty party. *Commonwealth v. Carthon,* 467 Pa. 73, 354 A.2d 557 (1976); *Commonwealth v. Trafford,* 312 Pa.Super. 578, 459 A.2d 373 (1983).

■ The fact that there was a fire in this case has been established. Lieutenant Schneiders testified that the fire was started intentionally with an open flame. The testimony placing appellant at the victim's home and testimony that a man fitting appellant's description was seen running out of the home at the time of the fire, along with the obvious motive of covering up the crimes of murder, supports the jury's conclusion of guilt.

■ Appellant was also convicted of burglary.[6] In order to prevail on a charge of burglary, the Commonwealth must prove beyond a reasonable doubt that there was an entry of the building or occupied structure by the defendant, with contemporaneous intent on the part of the defendant of committing a crime therein, at a time when the premises were not open to the public and the defendant was not then licensed or privileged to enter. *Commonwealth v. Stanton,* 479 Pa. 521, 388 A.2d 1053 (1978).

Appellant contends that the Commonwealth has failed to show an entry absent license or privilege. Appellant also argues that the Commonwealth has failed to prove the intent required to convict him of burglary.

■ The evidence presented indicates that the victim's front door was closed and locked when appellant was first seen at Joseph Gregg's car. Later, the door was open and

(1) he commits the act with the intent of destroying or damaging a building or unoccupied structure of another;

(2) he thereby recklessly places an inhabitated building or occupied structure of another in danger of damage or destruction ...

**6.** 18 P.S. § 3502(a) provides: A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter.

appellant was still in the immediate vicinity. Testimony indicates that the screen door was ripped open and the front door was forced open as evidenced by the cracked door jamb. The evidence of forced entry combined with evidence of the crimes committed within the victim's home was sufficient for the jury to conclude that appellant had the intent to commit burglary when he entered the home. "[I]ntent need not be directly proved, but may be inferred from the circumstances surrounding the incident out of which the charges arise," *Commonwealth v. Hardick,* 475 Pa. 475, 479, 380 A.2d 1235, 1237 (1977), and "[s]pecific intent as to the crime of burglary may be inferred from the circumstances surrounding entry of the accused." *Commonwealth v. Kennedy,* 499 Pa. 389, 394, 453 A.2d 927, 929 (1982). The evidence of forced entry was also sufficient for the jury to conclude that appellant was not licensed or privileged to enter the premises.

Based on our review of the record, we conclude that the evidence presented was sufficient to sustain appellant's convictions. Therefore, the trial judge properly overruled appellant's demurrer, as well as denying his motion for a directed verdict. In addition, because there was sufficient evidence of the crimes collateral to the murder the court was correct in allowing the jury to consider these crimes as aggravating circumstances.[7]

Appellant next contends that the prosecutor's conduct at trial constituted reversible error. Specifically, he argues that the prosecutor's statements that he was "lifting the hood of Joseph Gregg's car, something that he had no right to do," and the prosecutor's statement in closing that the killings were "without mercy and without remorse," were inflammatory, and unduly prejudiced appellant.

---

7. 42 Pa.C.S. § 9711(d) provides in relevant part:
 Aggravating circumstances shall be limited to the following:
 (6) The defendant committed a killing while in the perpetration of a felony.
 (7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

A prosecutor's remarks fall within the ambit of fair comment if they are supported by evidence and they contain inferences which are reasonably derived from that evidence. *Commonwealth v. Barren,* 501 Pa. 493, 462 A.2d 233 (1983). A new trial is not mandated every time a prosecutor makes an intemperate or improper remark. To constitute reversible error, the language must be such that its unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility towards the defendant, so that they could not weigh the evidence and render a true verdict. *Commonwealth v. Dreibelbis,* 493 Pa. 466, 426 A.2d 1111 (1981). Certainly, appellant's attempt to raise the hood of Joseph Gregg's car with a crow bar raised the inference that it was something "he obviously had no right to do."

As to the second allegedly inflammatory statement, extensive evidence was offered in this case concerning the murders of Joseph Gregg and Ernestine Dennis. The police officer investigating the crime scene testified as to the condition of the victims' bodies when they were found. The medical examiner testified as to the number, direction and severity of the approximate 67 stab wounds on the victims' bodies. In light of the amount, quality, and character of the evidence offered, the prosecutor's comments were reasonably derived from the evidence.

Appellant also contests the prosecutor's use of a double negative when commenting on Jeanette High's testimony. The prosecutor stated that Jeanette High "did not identify the defendant as being that person, but likewise she did not say that that person was not the defendant." We must examine the context in which the remarks were offered.

Defense counsel in his closing contended that Jeanette High knew appellant for three or four years. She observed a young black man running out of Joseph Gregg's home. She could not identify this man; therefore, it was argued, he was not appellant. The prosecutor's remarks were in response to this latter conclusion, and were supported by evidence. *Barren, supra.*

██ Appellant further contends that it was improper for the prosecutor to argue the law in her closing argument. It is obviously improper for counsel to misstate the law or to state it in a manner calculated to confuse the jury; however it does not follow that counsel must refrain from any discussion whatsoever of applicable law. *Commonwealth v. Gwaltney*, 479 Pa. 88, 387 A.2d 848 (1978). In the instant case, appellant does not contend that the prosecutor misstated the law, only that she argued it in closing. Appellant's argument on this point is therefore without merit.

██ Appellant next challenges the fact that the trial judge did not suppress his pre-trial statement and out of court identification, and alleges that there was no probable cause for the issuance of an arrest warrant. Our review indicates that the police obtained information as to the appellant's identity from witnesses at the scene of the crime. The police put together a photo spread, including the appellant's picture, based on this information. The photo spread was shown to four of the Commonwealth witnesses who picked appellant's photo and identified him by name. Each witness knew appellant for a substantial amount of time, as they all lived in the same neighborhood. A sufficient independent basis existed for each witness to identify appellant, and therefore there was probable cause for the issuance of an arrest warrant.

As for the refusal of the trial court to suppress a pre-trial statement, there is no evidence that appellant's statement was admitted at trial. Therefore, we need not reach the argument on that issue.

Appellant next contends that the trial court erred in not sustaining his motion relating to the jury charge on circumstantial evidence. In the trial judge's charge he instructed the jury that if you "entered a theatre at one o'clock in the afternoon and the sun was shining and you came out, the streets were wet, the sides of the buildings were wet and some people had their umbrellas up, one could infer that it had rained." Appellant wanted to add the statement "it would be open to other logical conclusions, such as the

streets had been washed." This is not a logical conclusion from the hypothetical example. Appellant's motion was properly denied.

■ Appellant also alleges that the trial court erred in failing to grant his challenges for cause as to five jurors. However, defense counsel removed all five jurors from the panel with peremptory challenges. At the conclusion of jury selection, defense counsel had two peremptory challenges remaining. When the defense does not exhaust its peremptory challenges, it is harmless error to overrule a challenge for cause which should have been sustained, if the juror is actually excluded by a peremptory challenge. *Commonwealth v. Moore*, 462 Pa. 231, 340 A.2d 447 (1975). Therefore, appellant's argument is without merit as to the five jurors removed.

■ Appellant next contends that the trial judge erred in overruling his objection to the granting of a challenge for cause as to two jurors. The decision whether to disqualify [a juror] is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion. *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985); *Commonwealth v. Black*, 474 Pa. 47, 376 A.2d 627 (1977).

■ In the first instance, the juror stated that she did not know if she could vote for the death penalty. The Commonwealth challenged for cause and the trial judge, over defense counsel's objection, granted the challenge. In the second instance, the juror stated that he was against capital punishment. He also stated that he was sure that he could not vote for the death penalty. The trial court, over defense counsel's objections, granted the Commonwealth's challenge for cause.

The Constitution does not prohibit removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent, or substantially impair the performance of their duties at the sentencing phase of trial.

*Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Likewise, we have reached a similar result. *See Colson, supra.* Therefore, the trial judge did not abuse his discretion in granting the challenges in question.

Appellant also raises various constitutional challenges to Pennsylvania's death penalty statute,[8] most of which have been previously addressed by this Court.

For instance, appellant claims that the death penalty would inflict cruel and unusual punishment on him and it violates the standards of decency that have evolved in Pennsylvania. This Court has stated that Pennsylvania's death penalty statute does not violate the constitutional prohibition against cruel and unusual punishment. *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987).

Appellant next argues that the death penalty statute does not permit the sentencing body enough latitude in taking into account the particular circumstances of the crime and the individual history and character of the convicted person. Along with this argument appellant contends that the statute does not clearly define aggravating circumstances, and the sentencing body is not fairly allowed to consider proper, complete, reasonable and fair mitigating circumstances; and, the statute frustrates a fair weighing against each other of aggravating and mitigating circumstances. Each of these arguments has previously been expressly considered and rejected by this Court. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

Appellant next contends that the death penalty statute is arbitrary and capricious, and fails to direct and limit the discretion of the sentencing body. We have already stated that Pennsylvania's decision stage in death sentenc-

8. Act of March 26, 1974, P.L. 213, No. 46 § 3 *as amended.*

ing does not interject an impermissible element of arbitrariness into the sentencing process or encourage capricious results. In the sentencing hearing, the jury's (or judge's) discretion is guided by definitive standards to ensure that the verdict is not arbitrary or capricious. *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

 Appellant contends that the discretion of the Commonwealth to seek or not to seek the death penalty vitiates fairness and equal protection of the law. However, we have stated that "[a]bsent some showing that prosecutorial discretion is being abused in the selection of cases in which the death penalty will be sought, there is no basis for appellant's assertions [that the statute violates the Eighth Amendment]." *Commonwealth v. DeHart*, 512 Pa. 235, 262, 516 A.2d 656, 670 (1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987). The same rationale can be applied to appellant's unsupported equal protection challenge. Therefore, absent some actual showing of prosecutorial abuse of discretion, appellant's argument is without merit.[9]

Appellant cites *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977), *cert. denied*, 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978), in support of his arguments. However, *Moody*, was based on Pennsylvania's prior death penalty statute, and therefore is inapplicable.[10] Pennsylvania's current death penalty statute has been found to be constitutionally valid. *Zettlemoyer, supra.*

9. Appellant raises two other issues which are simply restatements of his prior arguments. They are: the aggravating circumstances in the statute are too broad, too wide, unfairly allow for arbitrary grants of mercy, and are susceptible to widely differing interpretations; and, the scope of evidence and argument allowed the Commonwealth at the presentence stage is too wide and prejudicially broad.

10. The Court in *Moody, supra.,* in fact declared the Act of December 6, 1972, P.L. 1482, No. 334, § 1311 added March 26, 1974, P.L. 213 No. 46 § 3 *immed.* effective, constitutionally invalid for the reasons articulated by appellant. However, the constitutional defects of the prior statute were cured when the General Assembly enacted the Act of July 9, 1976, P.L. 586, No. 142 effective June 27, 1978.

 Finally, it is the practice of this Court to conduct a proportionality review of each case in which the death penalty is imposed. Our review focuses on whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering the circumstances of the crime and the character of the defendant. 42 Pa.C.S. § 9711(h)(3)(iii). In the present case, the jury found the presence of two aggravating and two mitigating circumstances.[11] The jury found that the aggravating circumstances outweighed the mitigating circumstances, therefore the sentence of death was imposed.[12]

In a recent case involving a double homicide committed while in the course of a felony, where the defendant had no significant prior criminal record, we held that the death penalty was not disproportionate to the crime. *Peterkin, supra.* In addition our independent statistical review shows that appellant's sentence of death is not disproportionate.[13]

For the above listed reasons, the judgment of sentence of

11. The aggravating circumstances as found by the jury according to 42 Pa.C.S. § 9711(d) were:
 (6) The defendant committed a killing while in the perpetration of a felony and;
 (7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.
 The jury found the mitigating circumstances according to 42 Pa.C.S. § 9711(e) to be:
 (1) the defendant had no significant history of prior criminal convictions;
 (4) the age of the defendant at the time of the crime.

12. 42 Pa.C.S. § 9711(c)(iv) provides in relevant part.
 The verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances ...

13. Our statistics are based on the "Pennsylvania Death Penalty Study" ordered by *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). This study is continuous and imposes an obligation on the President Judge of every county to supply updated data to the Administrative Office of the Pennsylvania Courts on each first degree murder conviction.

death is affirmed.[14]

FLAHERTY, J., files a concurring opinion.

NIX, C.J., files a dissenting opinion.

STOUT, J., did not participate in the consideration or decision of this matter.

FLAHERTY, Justice, concurring.

There is a great deal of truth to the point made by Mr. Chief Justice Nix in his dissenting opinion, but short of the elimination of peremptory challenges altogether, a move I favor, I join the majority opinion.

As long as there are peremptory challenges such will be used as the Chief Justice suggests regardless of the test this Court adopts. Furthermore, I believe racial and ethnic exclusion by this method is not limited to blacks.

Inasmuch as peremptory challenges are not constitutionally required and there is of course the rigth to challenge for cause, I see no reason to continue a practice so inherently susceptible to uncheckable abuse.

NIX, Chief Justice, dissenting.

I must dissent.

The state's use of peremptory challenges to exclude jurors on the basis of race has been condemned by the United States Supreme Court as being violative of the equal protection clause in the Fourteenth Amendment of the federal constitution. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). As the Court in *Batson* observed, "[e]xclusion of black citizens from service as jurors is a primary example of the evil the Fourteenth Amendment was designed to cure." 476 U.S. at 85, 106 S.Ct. at 1716. Purposeful racial discrimination in the selec-

**14.** The prothonotary of the eastern district is directed to transmit to the Governor as soon as possible, the full and complete record of all proceedings below and of review of this Court, as required by 42 Pa.C.S. § 9711(i).

tion of jurors violates a defendant's right to equal protection because it denies him the protection that trial by jury is intended to secure. *Id.* 476 U.S. at 86, 106 S.Ct. at 1717. The accused, whose life or liberty is to be put on trial, is not the only person whose right is violated; such discrimination also denies equal protection to the excluded juror. *Id.* 476 U.S.at 87, 106 S.Ct. at 1717–1718.

Despite the facile lip-service generally paid to the above constitutional principles, they are effectively nullified by evidentiary requirements that virtually insulate a prosecutor's use of the peremptory challenge to exclude jurors. In the law's present stage of development, the defendant has the burden of proving purposeful racial discrimination in the prosecutor's use of peremptory challenges. Even if the defendant succeeds in establishing a *prima facie* case of such discrimination, the prosecutor can defeat the claim if the hearing court accepts his "neutral explanation" for excluding jurors of the defendant's race.

As Mr. Justice Marshall observed in *Batson*, "[a]ny prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill-equipped to second-guess those reasons." 476 U.S. at 106, 106 S.Ct. at 1728 (Marshall, J., concurring). Justice Marshall pointed out that, if easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes, then the constitutional prohibition against racially-based juror exclusion is illusory. *Id.* Those considerations, and the inherent potential of peremptory challenges to distort the jury process by allowing the exclusion of jurors on racial grounds, led Justice Marshall to the conclusion that peremptory challenges should be banned entirely from the criminal justice system. *Id.* 476 U.S. at 107, 106 S.Ct. at 1728–1729.

We in this Commonwealth, the birthplace of that document that first assured the people of this nation of equal protection under the law, have a unique responsibility to assure the effective application of this principle to all of our citizens. This unique responsibility has been recognized and specifically acknowledged in the Declaration of Rights

under our State Constitution. Article I, section 26 mandates, in the clearest of terms:

### § 26. No discrimination by Commonwealth and its political subdivisions

Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

Clearly the right to a fair and impartial jury is a civil right of all Pennsylvanians. *See* Article I, section 6. Moreover, Article I, section 28 requires that "equality of right under the law shall not be denied or abridged." This mandate precludes us from being content with any procedural safeguard which is inherently ineffective in preventing any type of prohibited discrimination in the jury selection process. I agree with Mr. Justice Marshall that "[m]erely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge." *Id.* 476 U.S. at 105, 106 S.Ct. at 1727 (Marshall, J., concurring). Failure to effectively secure the rights guaranteed under Article I, section 26 denies the legitimate expectation of fairness and perpetuates the frustration that minorities have already too long endured.

The instant record reflects that the Commonwealth used fourteen of its peremptory challenges, twelve of which were directed against black jurors. There were 14 persons of the black race in the panel from which the selection was made. Only one black juror served as a juror in this case. The arbitrary nature of the concept of peremptory challenges renders it impossible to effectively prevent its use as a discriminatory tool. The willingness of this Court to accept the nondiscriminatory explanation given by the Commonwealth further emphasizes the inadequacy of this remedy. Nor does the fact that it may have been unconsciously injected in this case mitigate the evil involved. This was recognized by Justice Marshall in *Batson:*

Nor is outright prevarication by prosecutors the only danger here. "[I]t is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal." *King* [v. County of Nassau] *supra* [581 F.Supp. 493] at 502 [E.D.N.Y.1984]. "A prosecutor's own ... unconscious racism may lead him easily to the conclusion that a prospective black juror is "sullen," or "distant," a characterization that would not have come to his mind if a white juror had acted identically. A judge's own ... unconscious racism may lead him to accept such an explanation as well supported. As JUSTICE REHN-QUIST concedes, prosecutors' peremptories are based on their "seat-of-the-pants instincts" as to how particular jurors will vote." *Post* [476 U.S.] at 138 [106 S.Ct. at 1745]; see also THE CHIEF JUSTICE's dissenting opinion, *post*, at 123 [106 S.Ct. at 1736–1737].

476 U.S. at 106, 106 S.Ct. at 1728 (Emphasis in original).

What cannot be ignored is that the integrity of the adjudication process is not dependent upon the existence of peremptory challenges. Challenges for cause were designed to assure fair and impartial fact finding tribunals and have adequately served that purpose. Peremptory challenges provide only the gratuitous introduction of an arbitrary element into the process. Because of their inherent arbitrary character, their continued use in criminal trials by either the Commonwealth or defense should no longer be condoned. The mischief is exacerbated when it is permitted in capital trials. Its use by the Commonwealth, to the detriment of the civil rights of a citizen, is unquestionably inappropriate under Article I, section 26 of our Constitution.

Although a majority of this Court has employed the test prescribed by a majority of the United States Supreme Court in *Batson* for determining the validity of an alleged Fourteenth Amendment violation (I have serious reservations as to the legitimacy of its application even of that test to the instant facts), I am of the view that we have the additional responsibility in this jurisdiction to ban the use of

peremptory challenges in criminal trials where arbitrary considerations could conceivably be a factor. The ironic feature of this case is that the defendant, a black male, was accused of brutally killing, robbing and burglarizing the home of an elderly black couple. The situation was further exacerbated by an attempt to burn the premises to cover these horrendous acts. The fact that one would conceive that ethnic origin would sway a jury in this factual setting, even if the victims had been of another race, clearly demonstrates the type of erroneous assumptions that underpin racial thinking in our nation today.

I therefore dissent and would award the grant of a new trial before a trier of fact constitutionally constituted.