J-A02037-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| DAVID WIGGINS | |
| Appellant | No. 1668 EDA 2015 |

Appeal from the Judgment of Sentence May 1, 2015
in the Court of Common Pleas of Delaware County Criminal Division
at No(s): CP-23-CR-0007117-2013

BEFORE: OTT, RANSOM, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED DECEMBER 08, 2017**

Appellant, David Wiggins, appeals[1] from the judgment of sentence entered in the Delaware County Court of Common Pleas after a jury found him guilty of murder of the second degree,[2] robbery,[3] conspiracy,[4] and persons not to possess firearms.[5] Appellant claims that the trial court erred in denying a motion to strike a prospective juror for cause and that the court erred in issuing a jury instruction regarding consciousness of guilt. We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] The appeals of Appellant's codefendants, Tariq Mahmud and Rita Elizabeth Pultro, are listed at J-A02035-17 and J-A02036-17, respectively.

[2] 18 Pa.C.S. § 2502(b).

[3] 18 Pa.C.S. § 903.

[4] 18 Pa.C.S. § 903.

[5] 18 Pa.C.S. § 6105.

Appellant's conviction arises from the killing of Jason McClay at a Rite Aid store in the City of Chester, where McClay was a manager. The Commonwealth alleged the following. In August and September 2013, Tariq Mahmud was employed as loss prevention agent at the Rite Aid store. Mahmud, Ashaniere White, and Christopher Parks planned to rob the Rite Aid store. Mahmud told White and Parks about how much money was kept in the store's safe, who was working, and about blind spots in the store's video surveillance system. Mahmud warned them not to try to rob the store when McClay was working, because he was a former marine who would fight back.

On August 19, 2013, White and Parks robbed the Rite Aid store when McClay was not on duty. On August 26 and September 4, 2013, White and Parks again attempted to rob the store, but abandoned the plans when employees recognized White.

Mahmud, White, and Parks thereafter sought the assistance of new people to rob the store, and they brought Appellant into their planning. Appellant wanted another individual, Rita Pultro, to participate as well. The group planned a robbery for September 18, 2013, but postponed it until September 19, 2013.

On September 19, 2013, McClay worked the day shift at the Rite Aid store and stayed for the evening shift due to the unavailability of another manager, Serita Cottman. Mahmud called out from work that day. At approximately 9:45 p.m., an employee saw a white female, later identified as

Pultro, and a black male, later identified as Appellant, enter the store. Pultro retrieved a light bulb and took it to the counter. When the employee told her the amount due, Pultro complained that it was too expensive, placed the item back on the shelf, and asked to see the manager. McClay went back to the aisle, and he and Pultro began discussing lightbulbs. Appellant then grabbed McClay and told McClay to take him to the safe. Appellant and McClay began wrestling until Pultro shot McClay at close range at the base of his neck and killed him. Appellant and Pultro fled from the store and left the scene in a vehicle driven by Parks.

The investigation into the shooting revealed that Appellant left a palm print in the Rite Aid store. Investigators obtained a photograph of Appellant and showed it to two employees, and they both identified Appellant as one of the robbers.

On September 21, 2013, officers obtained a warrant to arrest Appellant and proceeded to his residence in Philadelphia. Philadelphia Police Officer Daniel Farrelly was dressed in full uniform and stationed at the rear door of the residence with his partner. Officer Farrelly heard other officers execute a "knock and announce" at Appellant's front door. N.T., 2/6/17, at 134. Approximately ten seconds later, he observed Appellant starting to exit from the rear door. Officer Farrelly drew his weapon and ordered him to stop and put his hands up. When Appellant saw the officers, he attempted to slam the door shut, but Officer Farrelly managed to keep the door open, enter into the

basement storage area of the residence, and take Appellant into custody. After begin given **Miranda**[6] warnings, Appellant gave an inculpatory statement regarding his participation in the robbery and indicating that while he was wrestling with McClay, he heard a shot. Pultro, Mahmud, Parks, and White, Parks were subsequently arrested. Parks and White pleaded guilty to third-degree murder in exchange for their cooperation, and the Commonwealth dropped the charges of second-degree murder against them.

Appellant, Mahmud, and Pultro proceeded to a joint jury trial for the September 19, 2013 robbery and killing of McClay. Parks and White testified against them. The Commonwealth also introduced numerous text messages between the various parties. The jury found Appellant guilty of second-degree murder, robbery, and conspiracy. The trial court sentenced Appellant to life imprisonment on May 1, 2015.

Appellant timely appealed and complied with the trial court's order to submit a Pa.R.A.P. 1925(b) statement. Appellant filed a supplemental Rule 1925(b) statement, which the trial court also addressed. This appeal followed.

Appellant presents the following questions for review:

> 1) Whether the trial court erred in denying the motion to strike prospective juror number 56 for cause since his wife was a crime victim and he could not state with any certainty that he could be fair and impartial?
>
> 2) Whether the court erred when it instructed the jury that flight demonstrates consciousness of guilt since that charge was not supported by the facts of this case?

---

[6] **Miranda v. Arizona**, 384 U.S. 436 (1966).

Appellant's Brief at 5.

Appellant first contends that the trial court erred in denying his motion to strike a prospective juror, juror #56, for cause. Appellant argues the prospective juror indicated that his wife had been a victim of a robbery, he had read about the case in the newspaper, and his ability to decide the case fairly was in question. He contends that the prospective juror continued to equivocate but was "essentially pressured to say that he would follow the instructions of the court." Appellant's Brief at 18. Appellant further notes that the defense ultimately struck juror #56,[7] but argues that he suffered prejudice because the defense exhausted their peremptory challenges. No relief is due.

Our standard of review is as follows:

> A trial court's decision regarding whether to disqualify a juror for cause is within its sound discretion and will not be reversed in the absence of a palpable abuse of discretion. In determining if a motion to strike a prospective juror for cause was properly denied our Court is guided by the following precepts:

> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor. . . . It must be determined whether any biases or prejudices can be put aside on proper instruction of the court. . . . A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or

---

[7] The Commonwealth was given nine peremptory strikes, and each of the three codefendants were given three peremptory strikes.

> witnesses that the court will  presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct or answers to questions.

***Commonwealth v. Briggs***, 12 A.3d 291, 332-33 (Pa. 2011) (citations omitted).

In ***Commonwealth v. DeHart***, 516 A.2d 656 (Pa. 1986), a prospective juror in a murder trial disclosed that her friend had been murdered.  During questioning, the trial court asked whether she would be affected in her deliberations by the experience, and the juror responded that she did not "know exactly how [she] would feel," that she "would want to be fair," but that she felt strongly about the person who killed her friend.  ***DeHart***, 516 A.2d at 662-63.  When asked whether she would be able to decide the case based solely on the facts, evidence, and the law issued by the court, she replied, "Yes, I think I would."  ***Id.*** at 663.  The trial court denied the defendant's motion to strike the juror for cause, forcing the defendant to use a peremptory strike.  ***Id.*** at 662.

Following the defendant's conviction and appeal, the ***DeHart*** Court found no reversible error, reasoning that the juror's answer "while somewhat equivocal, reveal[ed] neither a clear predisposition to convict nor an inability to follow the law and her testimony that she believed she was willing and able to be fair and impartial was believed by the trial court."  ***Id.*** at 663.

In ***Commonwealth v. Johnson***, 445 A.2d 509 (Pa. Super. 1982), a prospective juror in a robbery case stated that his daughter was the victim of

a robbery and rape with facts similar to the case in that matter. The juror became distressed noting that he practically broke down. *Johnson*, 445 A.2d at 512. The juror repeatedly acknowledged that he was surprised at how he was reacting and how strongly he felt. *Id.* However, when asked whether he could be fair, the juror answered, "Yes." *Id.* at 513. The trial court denied the defendant's motion to strike the juror for cause, forcing the defendant to use a peremptory challenge. *Id.* at 514. The defendant exhausted his peremptory challenges. *Id.*

Following the defendant's conviction, he appealed. The *Johnson* Court granted a new trial based on the failure to strike the juror. *Id.* The Court observed that the juror "vividly demonstrated he would not likely be an impartial juror," "expressed substantial doubts about his ability to be impartial at least five times," and conceded that even if he could logically separate the incident with his daughter from the defendant's case," he did not have full emotional control. *Id.*

With respect to prejudice, this Court has stated that a new trial will be granted when "a defendant is forced to use one of his peremptory challenges to excuse a prospective juror who should have been excused for cause, and then exhausts his peremptories before the jury is seated, a new trial will be granted." *Johnson*, 445 A.2d at 514; *see also Commonwealth v. Penn*, 132 A.3d 498, 505 (Pa. Super. 2016). However, "[w]hen the defense does not exhaust its peremptory challenges, it is harmless error to overrule a

challenge for cause which should have been sustained, if the juror is actually excluded by a peremptory challenge." ***Commonwealth v. Hardcastle***, 546 A.2d 1101, 1110 (Pa. 1988) (citation omitted).

Instantly, the record contains the following examination of juror #56:

> THE COURT: Sir, you gave a "yes" response to three of my questions, one was having known something or heard about the case, a victim of a similar crime, and either living or working in the vicinity?
>
> JURY PANELIST #56: Yes.
>
> THE COURT: So could you elaborate on all those, why you gave a "yes" response to those?
>
> JURY PANELIST #56: The first one was?
>
> THE COURT: The first one was hearing about the case or reading about the case.
>
> JURY PANELIST #56: Oh, I read the newspaper constantly. I am a subscriber to the *Wilmington Journal* and I read the Sunday *Daily Times* every day -- every Sunday.
>
> THE COURT: So when's the last time you heard about this case or read about it?
>
> JURY PANELIST #56: Last time, when it was active, a couple -- what's it, two years?
>
> THE COURT: Pardon?
>
> JURY PANELIST #56: When it was active, when they were--
>
> THE COURT: Which would have been, what --
>
> JURY PANELIST #56: Two years --
>
> THE COURT: Okay.

JURY PANELIST #56: -- I've heard this.

THE COURT: So the last time you read anything about the case or heard anything about the case?

JURY PANELIST #56: Yes. Um-hum.

THE COURT: Okay, Someone you knew --

JURY PANELIST #56: My wife --

THE COURT: -- victim of a similar crime?

JURY PANELIST #56: Yes, my wife was robbed while she was working in a supermarket, and we work midnights. I work at another store but that -- but a fellow came up with his couple groceries. As soon as the register opened, he picked up his shirt, showed her a pistol, said empty the register, and so that was -- I thought that was pretty similar.

THE COURT: Okay. All right. And you live or work in the vicinity of --

JURY PANELIST #56: I'm about three miles directly down Market Street.

*     *     *

THE COURT: And have you ever been in that particular Rite Aid?

JURY PANELIST #56: In it? No, sir.

THE COURT: Okay. Anyone else have any questions for juror #56?

MS. RAINEY [Appellant's counsel]: Sir, does the fact that your wife was robbed similar as you say in a grocery store, does that impact your ability to be fair in this particular case? Are you going to be thinking about that?

JURY PANELIST #56: Probably not. It happened 25 years ago.

MS. RAINEY: Okay.

JURY PANELIST #56: Probably not.

MS. RAINEY: But you're not sure; that's why you're saying "probably"?

JURY PANELIST #56: Can I tell you what's in the back of my mind?  I was going to say (inaudible) --

MS. RAINEY: Okay.

JURY PANELIST #56: -- leaning towards like 51 percent not but --

MS. RAINEY: Thank you for being honest.

THE COURT: All right.  Any other -- anyone else?

\*       \*       \*

MR. WISMER [Pultro's counsel]: . . . What do you remember reading about the case?

JURY PANELIST #56: Just the fellow got killed, he was the store manager.  I forget what -- he was helping somebody or something and he -- oh, he was -- he covered for a day off for somebody so he shouldn't even have been there that day and it struck me as no good deeds go unpunished.  I say that all the time.

MR. WISMER: Is that all you remember reading?

JURY PANELIST #56: Pretty -- for the most part.  That's the highlights, yeah.  I mean I don't remember exactly how many people were involved, you know, or how -- too much of the details.

MR. WISMER: And it was tragic, certainly, but does that -- is that going to affect your ability to be a fair and impartial juror knowing what you know about what happened to this man?

JURY PANELIST #56: Probably not. Again, I'm going to say probably 51 percent on it.

THE COURT: Let me phrase the question a little differently.

JURY PANELIST #56: Please.

THE COURT: Is there a doubt in your mind about your ability to be fair and impartial?

JURY PANELIST #56: No. I can do it. I can do it.

THE COURT: All right. Anyone else?

MR. TINARI [Mahmud's counsel]: May I just follow that up briefly?

THE COURT: Yes.

MR. TINARI: It seems as though you're hesitating. There's no right or wrong answer even to the Judge's question. We're just trying to find out --

JURY PANELIST #56: I

MR. TINARI: -- what's in your heart and your mind, and when -- as lawyers especially for Defendants who are accused of crimes, we hear probably or 51 percent, that makes us nervous. So we're just asking you --

JURY PANELIST #56: Absolutely.

MR. TINARI: -- just as the Court did, it seems as though there's a little bit of hesitation, and if there is, just tell us. It's okay. No one's going to --

JURY PANELIST #56: And I realize –

MR. TINARI: -- thinking negatively of you --

JURY PANELIST #56: -- you've got 120 -- 18 other people --

MR. TINARI: -- you know what I mean? We're --

JURY PANELIST #56: -- that you can use.

MR. TINARI: -- just trying to proceed in accordance with what we're required to ask.

JURY PANELIST #56: Yes.

MR. TINARI: And if your answer is you have some doubt, just tell us.

JURY PANELIST #56: I'd have to be saying I was kidding you if there was absolutely nothing because I experienced it.

MR. TINARI: Understood.

JURY PANELIST #56: But I still think I could probably be fair.  I mean I understand --

MR. TINARI: You still think you can be?  See, that's what's making us --

JURY PANELIST #56: I'm --

MR. TINARI: You know what I'm saying?  If you were in our shoes --

JURY PANELIST #56: I can --

MR. TINARI: -- you wouldn't want to hear someone say --

JURY PANELIST #56: I see.

MR. TINARI: -- well, I think I could be fair, I'm hoping I could be fair.

JURY PANELIST #56: I can appreciate your -- you on that. I think I can -- okay.  So --

MR. TINARI: All right.  I won't ask any more times.

JURY PANELIST #56: I

MR. TINARI: That's -- I think --

JURY PANELIST #56: I believe I can.

MR. TINARI: Okay.  Thank you, sir.

JURY PANELIST #56: I believe I can and I --

\*\*\*

MR. DIROSATO [for the Commonwealth]: Sir, the role of a juror is to hear the evidence –

JURY PANELIST #56: Exactly.

MR. DIROSATO: -- to weigh the evidence per the instructions given by the Court.

JURY PANELIST #56: Exactly.

MR. DIROSATO: And --

JURY PANELIST #56: I'm not trying to be rude.

MR. DIROSATO: -- the Court will give you the instructions on the law, take whatever facts as you find true along with your fellow jurors and apply that to the law to determine whether the Commonwealth has met its burden beyond a reasonable doubt to prove these Defendants guilty of the crimes they're facing -- have been charged with.

JURY PANELIST #56: Exactly.

MR. DIROSATO: And knowing that, can you put aside your past experience and follow the Court's instruction and render a verdict based upon a fair and impartial weighing of the evidence?

JURY PANELIST #56: I think I can.  I'm saying -- I said -- okay.  I can.  Putting it in context, you show me evidence, it is or it isn't.

MR. DIROSATO: If the Commonwealth fails to meet your -- meet its burden, would you hesitate and acquit these Defendants?

JURY PANELIST #56: If you didn't prove they did it, I will.

THE COURT: You understand that it has to be proven beyond a reasonable doubt. It's not a 51 percent. It's beyond a reasonable doubt. Do you understand that?

JURY PANELIST #56: Yes, sir.

THE COURT: And you could follow that standard, correct?

JURY PANELIST #56: Yes, sir. I'm sure I could.

N.T., 1/28/15, at 280-88.

Counsel for Mahmud moved to strike the juror for cause based on the juror's equivocation and hesitation in his responses. *Id.* at 288. Appellant's counsel joined the motion noting that the juror appeared to give two answers to each questions. *Id.* at 289. The trial court denied the defense's motion. *Id.* In its supplemental Rule 1925(a) opinion, the trial court emphasized that juror stated responded that he could "do it" when asked by the court whether he could be fair and impartial. Trial Ct. Supp. Op., 5/20/16, at 2.

Following our review, we are constrained to conclude that the trial court abused its discretion when denying Appellant's motion to strike juror #56. The juror equivocated several times regarding his ability to separate the incident involving his wife. He repeatedly used terms such as "I think," and "probably." When asked whether he could fair and impartial twice stated he was only "51 percent" certain. He hesitated at serving on the jury, noting

that numerous other prospective jurors remained. Although the juror ultimately stated that he was able to decide the case fairly and impartially based on the evidence, that fact alone does not allay concerns regarding the juror's ability to be impartial. **See Penn**, 132 A.3d at 505; **Johnson**, 445 A.2d at 514.

Although all three defendant exhausted their peremptory strikes, the record does not reveal which defendant struck juror #56.[8] Therefore, although Appellant exhausted his peremptory strikes, he has not demonstrated that he was forced to use his peremptory strike to exclude juror #56. Moreover, Appellant has not alleged that any of the empaneled jurors were impartial. Accordingly, Appellant has not demonstrated adequate prejudice to warrant relief.

Appellant next claims that the trial court erred in instructing the jury on consciousness of guilt. He first contends that there was insufficient evidence of flight to justify issuing the instruction. According to Appellant, he merely opened the back door of it and shut it after seeing armed police, but did not run or physically resist. He further asserts that there was no evidence he knew why the police were there or that he was about to be arrested. Second, Appellant contends that the trial court failed to instruct the jury that the credibility, weight, and effect of his flight was for them to decide as suggested

---

[8] The trial court afforded the Commonwealth and the defense nine peremptory strike. The defendants each had three peremptory strikes.

by Pa.SSJI (Crim.) § 3.15. We conclude that this issue is waived in part and otherwise meritless.

Preliminarily,

> [i]n order to preserve a claim that a jury instruction was erroneously given, the [a]ppellant must have objected to the charge at trial. As our Supreme Court has explained:
>
>> The pertinent rules, therefore, require a specific objection to the charge or an exception to the trial court's ruling on a proposed point to preserve an issue involving a jury instruction. Although obligating counsel to take this additional step where a specific point for charge has been rejected may appear counterintuitive, as the requested instruction can be viewed as alerting the trial court to a defendant's substantive legal position, it serves the salutary purpose of affording the court an opportunity to avoid or remediate potential error, thereby eliminating the need for appellate review of an otherwise correctable issue.

**Commonwealth v. Parker**, 104 A.3d 17, 29 (Pa. 2014) (citations omitted).

Instantly, Appellant did not object to the form or content of the consciousness of guilt instruction given by the trial court, and there is no indication that Appellant requested that the trial court add language to its proposed instruction. Therefore, we are constrained to conclude that Appellant's second contention—*i.e.*, that the instruction as given was defective—is waived due to Appellant's failure to alert the court to the alleged issue. **See id.**

As to Appellant's first contention, Appellant has not directed this Court to a specific objection to the trial court's decision to instruct the jury on

consciousness of guilt. Nevertheless, the record establishes that Appellant did object at some point as his counsel noted that she had taken an exception to "the flight nonsense[.]" N.T., 2/10/15, at 18. Moreover, the trial court did not find waiver of Appellant's contention that a consciousness of guilt charge was appropriate based on Appellant's attempt to evade the officers attempting to arrest him. Under these circumstances, we will address Appellant's contention that the evidence did not support a consciousness of guilt charge.

It is well settled that

> [a] jury instruction is proper if supported by the evidence of record. Th[e Pennsylvania Supreme Court] has held that "[w]hen a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred."

*Commonwealth v. Clark*, 961 A.2d 80, 92 (Pa. 2008) (citations omitted). "The theory for admitting evidence of flight is 'based upon a premise that the person who flees does so in recognition of his wrongdoing and is seeking to avoid punishment for that conduct.'" *Commonwealth v. Barnes*, 593 A.2d 868, 870 (Pa. Super. 1991) (citation omitted).

The record in this case belies Appellant's contention that the evidence did not support the consciousness of guilt instruction. The Commonwealth introduced evidence that Appellant was aware of his wrongdoing with respect to the killing of McClay, and that he knew of the possibility that he left fingerprints in the Rite Aid. Additionally, the Commonwealth presented

evidence that Appellant was aware that he was wanted by the police when officers conducted a knock and announce at the front door of his residence, and an officer in full uniform ordered him to stop as he emerged from the back of residence. Lastly, the Commonwealth's evidence suggested that Appellant sought to avoid punishment when he retreated back inside his home and attempted to close the door on the officers. Based on the foregoing, we agree with the trial court that the trial evidence could be construed as showing Appellant recognized his wrongdoing and was attempting to avoid punishment when he retreated into his home. Accordingly, we discern no error in the issuance of a consciousness of guilt instruction and that no relief is due on Appellant's final preserved issue.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2017