J-S76004-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RASHAWN DONTE AUSTIN, | |
| Appellant | No. 1536 WDA 2017 |

Appeal from the Judgment of Sentence Entered April 18, 2017
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0007243-2015

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED FEBRUARY 28, 2019**

Appellant, Rashawn Donte Austin, appeals from the judgment of sentence of 17-40 years' incarceration, imposed after he was convicted of third-degree murder and firearm offenses.  Appellant challenges the weight and sufficiency of the evidence supporting his conviction.  After careful review, we affirm.

The trial court provided the following summary of the facts adduced at trial:

> A [n]on-[j]ury trial commenced on January 17, 2017 and concluded on January 20, 2017.  The Commonwealth was represented by Assistant District Attorney Jonathan Fodi.  [Appellant] was represented by Ralph Karsh, Esquire.
>
> Prior to testimony, the Commonwealth placed a [s]tipulation on the record as to the cause and manner of death of the victim Derrick Owens via a report from the County of Allegheny Medical Examiner's Office, at Case No. 15COR03389.  On April 25, 2015, the victim Derrick Owens was examined by Dr. Kenneth Howard

Clark, associate medical examiner. The opinion of the associate medical examiner was that Derrick Owens, a 30 year old African American male, died as a result of a gunshot wound to the trunk. The final pathological diagnosis was a penetrating gunshot wound of the right upper arm, reentry into the right upper lateral chest. The manner of death was ruled a homicide. The shooting of Derrick Owens occurred on the evening of April 24, 2015, when it was dark.

The Commonwealth's first witness was Detective Judd Emery. Detective Emery had been employed by the City of Pittsburgh Police for 16 years. He was assigned to the violent crimes unit, homicide office, and was working in that capacity at the time of this homicide in April of 2015. Detective Emery was assigned to investigate the death of Derrick Owens. He arrived at the scene with his partner, Detective Bolin, and observed Mr. Owens lying in the driver's side area of a white SUV in the 1300 block of Columbus Avenue. According to Detective Emery, this block is located in the Manchester area of the City of Pittsburgh. The medics arrived shortly before Detective Emery and had already pronounced Mr. Owens deceased.

Detective Emery located a female, Sidney Smith, in the front passenger seat and two males in the backseat, Mark Kelly and a Mr. Williams (he was not 100% sure of the names of the male passengers). The detective was aware of a civilian in the neighborhood who was taking pictures, Christopher Litherland. The Mobile Crime Unit arrived at the scene and Detective Emery directed them to take pictures and measurements.

Sidney Smith was called as a witness on behalf of the Commonwealth. She recalled on April 24, 2015[,] being with Derrick Owens. Ms. Smith had only known him for a few months, but she liked him, and thought he was her boyfriend. However, after the shooting, she found out he was married. On that evening, at approximately 8 or 9 p.m., she was with Derrick and two of his friends parked on Columbus Street.

Ms. Smith stated[:] "We were driving around and we stopped at Shamrock on Western Avenue and me and him [victim Derrick Owens] grabbed a 40 ounce … of Olde English. It's a beer." Ms. Smith further testified[:] "We just got one to share … I took a couple of sips before everything happened." Ms. Smith did not remember the back seat occupant rolling blunts, "but she wasn't getting high, I don't get high."

While Ms. Smith was in the passenger seat, with victim Derrick Owens in the driver's seat and Mr. Owens' two friends in the back seat, Mr. Owens got out of the vehicle to stretch. As Mr. Owens got out, the driver door remained open and he was talking to all of the people in the vehicle.

According to Ms. Smith, a gentleman walked up toward the car and she identified [Appellant], in the [c]ourtroom, as the individual she saw walking up that night. She indicated the shooter walked up very smooth and calm. She observed him pull out a silver gun and point it at Mr. Owens' left side and shoot him twice. Mr. Owens then yelled that he was shot and he fell into the car. At first, Ms. Smith thought it was a joke but locked her eyes with the shooter then saw him walk away like a "smooth criminal." Mr. Owens' whole upper body fell into her lap and she observed blood coming out of his mouth. When Ms. Smith locked eyes with the shooter, he was close to her. Ms. Smith was able to describe that the shooter was wearing a light tan letterman jacket with sport patches. She called 911 and waited for the police to arrive. The shooter walked towards the back of the vehicle and the two people in the car ran away.

When the police arrived, she told them that someone came toward the truck and shot Mr. Owens. She told the police if she saw the shooter again she could identify him. The night of the shooting, the police officers took her to headquarters and showed her a photo array. It took Ms. Smith some time, but she eventually circled a photograph. She told the officers she wasn't real sure if that person was the shooter. A few days later, on May 28, the police brought Ms. Smith back in to look at a second photo array. She looked at the second array for approximately 10 minutes; selected and circled an individual on the array; signed and initialed her pick; and told the officers she was very positive this individual was the shooter. She once again identified [Appellant], in the [c]ourtroom, as the shooter she observed that night.

On cross-examination, she denied that the shooter wore a hoodie and again stated that the shooter was wearing a light tan letterman jacket. She also testified that the shooter was clean[-]shaven. On cross-examination, the following exchange with Ms. Smith occurred:

BY MR. KARSH:

Q. If [Appellant] had a beard, just like he has now, on the night of the shooting, he couldn't have been the shooter, right?

A. That is true. But he wasn't caught that night.

When questioned about whether it was dark on the street, Ms. Smith responded[:] "But I do recall it being bright enough that I can see." Ms. Smith further testified on cross-examination that she was approximately five feet from the shooter when he came upon the victim and she did not see any tattoos on him.

Regarding the identification of [Appellant] pursuant to the photo arrays, Commonwealth Exhibit 16 was the first photo Sidney Smith circled on the evening of the shooting. While she circled a photograph, she told the detective, "I wasn't real sure." The circled photograph, Commonwealth Exhibit 16, was identified as a photo of Mandol Ruggs by Detective Emery. Commonwealth Exhibit 17 was the photo array shown to Sidney Smith on April 28, 2015[,] at which time she circled the photo of [Appellant] as the shooter.

Detective Emery testified the procedures of the Pittsburgh Bureau of Police, for photo array presentation[,] utilize a double blind procedure. Because of his knowledge of the investigation, he will develop a suspect. Either he or his partner will develop a photo array. The photo array will be shown to the witness by an officer not involved in the investigation so as not to contaminate or taint the photo array. On cross[-]examination, Detective Emery testified the first photo array, Commonwealth Exhibit 16, was shown by Detective Schanck while Commonwealth Exhibit 17 was presented by Detective Hanlon. Neither Detective Schanck nor Detective Hanlon had any involvement in the investigation.

On cross-examination, Attorney Karsh showed Detective Emery Commonwealth's Exhibit 16 containing the photo of Mandol Ruggs. Detective Emery agreed Mandol Ruggs is a light skinned African-American male and Attorney Karsh's client, [Appellant], is medium toned if not dark toned. Detective Emery took exception with Attorney Karsh's conclusion, "Is it fair to say these guys don't look alike?" Detective Emery stated "they both have full faces Yes. They both look alike. Obviously they have a different skin tone."

Detective Emery obtained an arrest warrant for [Appellant] based upon the identification by Sidney Smith and his

investigation. After obtaining the Arrest Warrant, Detective Emery spoke with Traylon Austin at her residence in the 3800 block of California Avenue. Detective Emery went to the residence of Traylon Austin looking for [Appellant]. Eventually, with the assistance of the Fugitive Task Force, Detective Emery found [Appellant] in Room 441 of the In Town Suites on May 7, 2015. Detective Emery obtained a search warrant to search the hotel room. [Appellant] was alone in the hotel room. A cell phone was found on [his] person and a second cell phone was recovered from the hotel room. [Appellant] told Detective Emery he had been staying at the In Towne Suites (Hotel) for a month.

On redirect, Detective Emery indicated he obtained a search warrant for each of the two phones: the one found in the hotel room and the one on [Appellant]. Detective Emery turned the phones over to the computer crimes detectives to perform a forensic download. The detective also obtained court orders to send to the cell phone providers to retrieve the cell phone records, including the dates and times of calls and texts, as well as the cell towers used.

As part of the investigation, Detective Emery also had the opportunity to determine that [Appellant] did not have a license to carry a firearm and that he was a person not to possess a firearm. Attorney Karsh stipulated that his client did not have a license and was a person not to possess a firearm.

A [s]tipulation was entered between the Commonwealth and Defense Counsel that: "on approximately July 21, 2014, an investigation was initiated for a theft perpetrated by Derrick Owens, the deceased in this case." Officer Dulski, City of Pittsburgh Police Department, applied for an arrest warrant for Derrick Owens, alleging that Mr. Owens committed the crimes of theft and access device fraud with the victim being Traylon Austin, 3613 California Avenue, No. 1, Pittsburgh, PA 15212. Mr. Owens was charged with stealing approximately $895 from a SSI card that was located in the mailbox and that had been stolen.

The Commonwealth called Christopher Litherland to testify. Mr. Litherland had resided in Allegheny County for approximately four years. Mr. Litherland was a photographer and worked with people of special needs. On the evening of April 24, 2015, at approximately 9:00 p.m., Mr. Litherland was sitting in his car in the Manchester neighborhood of the City trying to photograph an abandoned house across the street, but his view was blocked by

- 5 -

an SUV parked in front of said house. He observed that the "guy or whoever got shot" was standing outside the car talking to a woman inside the car. Mr. Litherland next observed the shooter walking slowly up the sidewalk on Fulton Street and turn onto the left hand side of Columbus. The shooter turned and pulled his hand out of his pocket with a gun and shot the victim right in the chest. He then watched two men get out of the backseat of the SUV and run away in the opposite direction of the shooter, while the shooter slowly walked down the side of the street after the shooting had occurred.

Mr. Litherland then put his car in reverse and drove to the next block over to wait for the police to show. After the police arrived, he gave them the same description of events. When asked if he had a chance to see the shooter, he responded: "No. I could not see his face. He was wearing a hoodie, a gray hoodie with stripes on it and kind of darker pants. That is all I saw." He could tell the shooter was a male and approximate height was 5'9".

During cross-examination, Mr. Litherland recalled that the color of the hand of the shooter was black. He could tell the shooter was black from his face also. The Court questioned Mr. Litherland as to whether the police asked him if he could identify anybody if they showed him a photo array to which he responded, no because he had a hoodie on.

A stipulation was reached that Commonwealth Exhibit 18, obtained pursuant to the search warrants executed by the Pittsburgh Bureau of Police, contains cell phone records obtained from providers T-Mobile and AT&T for cell phone numbers 412-733-8717 and 412-315-5195, respectively. It was stipulated the records were kept in the regular course of business as authentic business records of those providers. Mr. Karsh further added it was his understanding that the records provided contain no substance of any calls, merely the calls or texts going out, the time they went out and where they have been. There was no dispute the two cell phones were the phones seized on May 7, 2015, from [Appellant].

Detective Lyle Graber was examined and testified regarding the cell phone records for the two cell phones. After extensive *voir dire*, Detective Graber was offered as an expert in analysis of cellular telephone records and mapping of cell site data. Once Detective Graber received the information contained in

Commonwealth's Exhibit 18, he prepared a report and power point. Commonwealth's Exhibit 19 is the power point prepared by Detective Graber. During Detective Graber's testimony, the slides which were contained in Commonwealth Exhibit 19 were marked Commonwealth Exhibits 20 through 52. The Court admitted Commonwealth Exhibits 19 through 52.

Essentially, Detective Graber explained a cell phone communicates with a cell tower or cell site. A cell tower is divided into three sections with each section having its own antenna covering approximately 120 degrees, comprising 360 degrees for the three sections. For a call to be ongoing, the cellphone has to interact or communicate with a cell tower/site. When the cellphone is moving or the user is traveling using the cell phone, different cell towers/sites will be utilized. As the cellphone is moving, the system is engineered to hand off the call to the next cell tower/site that has the strongest signal.

Detective Graber analyzed the cell detail records for the two cellphones, one of which was on [Appellant]'s person and the other in the hotel room occupied solely by [him]. Detective Graber explained the Cellular Call Detail Records (CDR) contain basic information such as, the target number, *i.e.*[,] the number in question, date, time, the duration of the call, the number called or calling the target number and the direction of the call. Direction of the call means whether it is an outgoing call from the target number or an incoming call to the target number. The CDR may also contain cell site information which includes identification of cell site and/or sites through which the communication is routed, cell site identifiers, location of cell site by latitude, longitude or closest address and the cell sector azimuth.

Detective Graber testified the one phone number was a Metro PCS telephone number serviced by the T-Mobile network while the other phone number was a Tracfone wireless serviced by the AT&T network.

Detective Graber testified the time of a call becomes important in light of the time of the homicide at or around 9:00 p.m. on April 24, 2015. Detective Graber identified a call from the Tracfone serviced by the AT&T network at 9:00 p.m. on April 24, 2015. With regard to the 9:00 p.m. call on April 24, 2015, the records establish the cell site utilized, the physical location of the cell site designated by latitude and longitude and the sector of the cell tower used for the communication. Similar information for the

T-Mobile cellphone provided the cell site and location for a specific call. The only difference in the records is that the T-Mobile records do not provide the azimuth information which prevents determining which of the three sectors on the cell tower the cell utilized.

Detective Graber testified about cell site mapping. As the homicide occurred on April 24, 2015 at approximately 9:00 p.m., Detective Graber tracked the cell phones for the period of one hour before the homicide and one hour after the homicide, a time range between 8:00 p.m. and 10:00 p.m. In addition, Detective Graber also tracked the site of the homicide [(]1307 Columbus Avenue, Pittsburgh, PA 15233[)], as well as the hotel in the North Hills where [Appellant] was arrested [(]4595 McKnight Road, Pittsburgh, PA 15237[)].

The first call tracked was at 8:08 p.m. It was an incoming call to the T-Mobile phone. The cell site utilized for the call was north of the city and shooting site, and just south of the 4549 McKnight Road address for the motel. The next three calls were outgoing calls between 8:10 p.m. and 8:36 p.m. for the T-Mobile phone. The cell sites utilized for these calls were south of the initial cell sites moving in a direction towards the city. Two additional calls were identified between 8:41 p.m. and 8:44 p.m.—one call incoming and the other outgoing from the T-Mobile cell. Again, for these calls the cell site was in or around the City of Pittsburgh Downtown/Northside/West area.

At 8:57 p.m., very close to the time of the homicide, there was an outgoing call from the T-Mobile phone indicating a cell site in or around the City of Pittsburgh Downtown Northside/West area in close proximity to the shooting site of 1307 Columbus Avenue, Pittsburgh, PA 15233.

Detective Graber testified at 9:00 p.m. there was both an incoming call to the T-Mobile phone and an incoming text to the phone utilizing the AT&T cell network. This again shows cell site usage in close proximity to the address of the homicide. Detective Graber tracked the 8:57 p.m. T-Mobile outgoing call and the 9:00 p.m. AT&T incoming call to the cell site in close proximity to the address of the shooting.

In response to the [c]ourt's questioning, Detective Graber indicated that the two phones could have been utilized by one person with each phone utilizing a different cell site in close proximity.

Shortly after the shooting occurred in the area of 1307 Columbus Avenue, Detective Graber testified there was an outgoing call from the T-Mobile phone. Pursuant to cell site mapping, cell towers north of the city were utilized for the call. The final three calls were for the T-Mobile phone between 9:52 p.m. and 9:54 p.m., one an incoming call and two outgoing calls. Again, mapping depicted cell sites utilized north of the City of Pittsburgh in or around the area of the motel at 4595 McKnight Road, Pittsburgh, PA 15237—the site of [Appellant]'s arrest.

After the [c]ourt denied [Appellant]'s Motion for Judgment of Acquittal, Attorney Karsh offered [Defense] Exhibits A and B. The Exhibits were admitted. [Defense] Exhibit A is a photograph of [Appellant] taken at the time of intake at the Allegheny County Jail on August 27, 2014. [Defense] Exhibit B is a photograph of [Appellant] on the date of his arrest on May 8, 2015[,] upon intake at the Allegheny County Jail. Both photos depict [Appellant] with a full beard as stated by Attorney Karsh.

In addition, Jazmen Washington was called as a defense witness. Ms. Washington testified that she had known [Appellant] for eight years. [He] is the father of her child. She stated that for as long as she had known [Appellant], he has always had a beard.

[Appellant] introduced an undated photograph of [him] holding his daughter. In the photo, [Appellant] has a beard and Ms. Washington believed that the photo was taken in February 2015. From January until the beginning of May of 2015, Ms. Washington testified that on the occasions when she saw [Appellant], he always had a beard. She indicated that sometimes [Appellant] stayed with her in the West End of Pittsburgh and other times he stayed at the In Town Suites, a hotel on McKnight Road.

On cross-examination, Ms. Washington admitted that there were times she didn't see [Appellant] for a couple of weeks and was not aware of his whereabouts. Ms. Washington stated when asked about the frequency of sightings, she replied: "No. I see him sometimes. Then I don't. See him sometimes. Then I don't."

Trial Court Opinion (TCO), 6/13/18, at 4-21 (citations omitted).

The Commonwealth charged Appellant with criminal homicide, 18 Pa.C.S. § 2501(a); person not to possess a firearm, 18 Pa.C.S. § 6105; and carrying a firearm without a license, 18 Pa.C.S. § 6106. After a non-jury trial held on January 17-20, 2017, the trial court found Appellant guilty of third degree murder and both firearm offenses. On April 18, 2017, the court sentenced Appellant to 17-40 years' incarceration for third degree murder, and to no further penalty at the remaining counts.

Appellant filed a timely post-sentence motion, which was denied by the court on September 20, 2017; he then filed a timely notice of appeal on October 20, 2017. Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on December 4, 2017. The trial court issued its Rule 1925(a) opinion on June 13, 2018.

Appellant now presents the following questions for our review:

I. Was the evidence insufficient to sustain the verdict of murder of the third degree when: S[i]dney Smith's identification evidence was inherently unreliable; her testimony and Mr. Litherland's testimony were contradictory; there was no physical evidence linking [Appellant] to the crime; a recovered cell phone was not in [Appellant]'s name, and the hotel room in which the cell phone was found was not in [Appellant]'s name?

II. Was the verdict contrary to the weight of the evidence when there was no physical evidence linking [Appellant] to the crime and Ms. Smith's testimony was contradictory and she initially selected someone else from a photo array?

Appellant's Brief at 5 (unnecessary capitalization omitted).

After a thorough review of the record, Appellant's brief, the applicable

law, and the comprehensive and well-reasoned opinion of the Honorable Philip A. Ignelzi, we conclude that there is no merit to Appellant's claims on appeal, and do so based on the reasons set forth in that opinion. *See* TCO at 21-33 (rejecting Appellant's sufficiency-of-the-evidence claim); at 33-35 (rejecting Appellant's weight-of-the-evidence claim).

Judgment of sentence *affirmed*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/28/2019

Received 10/1/2018 8:48:56 AM Superior Court Western District
Filed 02/04/2019 12:04 PM

Filed 10/1/2018 8:48:00 AM Superior Court Western District
ORIGINAL 1536 WDA 2017
Criminal Division
Dept of Court Records
Allegheny County, PA

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,                   1536 WDA 2017

v.                                              CC NO. 2015-07243

RASHAWN DONTE AUSTIN,

DEFENDANT.


OPINION

FILED BY:
HONORABLE PHILIP A. IGNELZI


COUNSEL FOR COMMONWEALTH:

Deputy District Attorney
Michael Streily, Esquire
401 Allegheny County Courthouse
436 Grant Street
Pittsburgh, PA 15219

COUNSEL FOR DEFENDANT:

Christine M. Selden, Esquire
Assistant Public Defender
Appellate Counsel
400 County Office Building
542 Forbes Avenue
Pittsburgh, PA 15219

FILED
2018 JUN 13 PM 1: 23
DEPT OF COURT RECORDS
CRIMINAL DIVISION
ALLEGHENY COUNTY, PA

# APPENDIX A

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      1536 WDA 2017

v.      CC NO. 2015-07243

RASHAWN DONTE AUSTIN,

DEFENDANT.

## OPINION

Ignelzi, J.

### PROCEDURAL HISTORY

By Criminal Information filed at CC 2015-07243 on May 7, 2015, Rashawn Donte Austin ("Defendant") was charged with: Count 1 – Criminal Homicide (18 Pa. C.S. § 2501(A); Count 2 - Persons Not to Possess a Firearm (18 Pa. C.S.A. § 6105 (a)(1)); and Count 3 - Carrying a Firearm Without a License (18 Pa. C.S.A. § 6106(a)(1)).

The Defendant, represented by Ralph Karsh, Esquire elected to proceed to a non-jury trial commencing January 17, 2017 before this Court. **Non-Jury Trial Transcript (TT), Volume I (Vol.), January 17, 2017, p. 4, l. 5 through p. 7, l. 17.** At

1

the conclusion of the nonjury trial, this Court found defendant guilty on all counts: Count 1 - with Criminal Homicide replaced by Murder of the Third Degree; Count 2 - Possession of a Firearm Prohibited; and Count 3 - Firearms not to be Carried without a License. **TT, Vol. III, dated January 20, 2017 at 4, l. 1-18.**

The Defendant requested a pre-sentence report and sentencing occurred on April 18, 2017. As to Count 1 - Murder of the Third Degree, Defendant was sentenced to confinement for a minimum period seventeen (17) years and a maximum period of forty (40) years. As to Counts 2 and 3, there was a determination of guilt without further penalty.

On April 27, 2018, Christopher Urbano, Esquire filed post-trial motions on behalf of Mr. Austin: an Omnibus Post-Sentence Motion; a Motion for Leave to File Supplemental Post-Sentence Motion; and a Motion for Extension of Time to Decide Motions. On May 2, 2017, this Court granted the Motion to File Supplemental Post-Sentence Motion and further granted the request for a thirty day extension beyond the 120 day period of Pa.R.Crim.P. 720 (B)(3)(a). On August 8, 2017, Mr. Urbano filed a Motion to Withdraw as counsel, which this Court granted and thereupon appointed the Office of the Public Defender to represent Mr. Austin.

2

As newly appointed counsel had neither the transcripts nor the trial file, no additional post-sentence motion could be filed within the one-time exception permitted under Pa.R.Crim.P. 720(B)(3)(b). On September 20, 2017, this Court denied the pending post-sentence motions. On October 20, 2017, the Defendant, through Christine M. Selden, Esquire, filed a timely Notice of Appeal. On October 23, 2017, this Court filed its 1925(b) Order requiring a Concise Statement of Errors to be filed within 21 days. Counsel was granted one extension of time to file the Concise Statement, and it was filed on December 4, 2017.

## STATEMENT OF ERRORS ON APPEAL

Defendant asserts two issues on appeal:

A. The evidence was insufficient to sustain the verdict of murder of the third degree when: Sydney Smith's identification evidence was inherently unreliable, especially since her testimony under oath at the preliminary hearing differed substantially from her trial testimony; she originally testified that the shooter was beardless and did not have tattoos; she had been drinking an alcoholic beverage; she selected someone else in the first photo array. Her testimony was contradictory to the testimony of witness, Mr. Litherland, on the clothing and actions of both the victim and the shooter; there was no physical evidence linking Mr. Austin to the crime; a recovered cell phone was not in Mr. Austin's name; the hotel room in which the cell phone was located was not in Mr. Austin's name; and there was no motive.

B. The verdict rendered was contrary to the weight of the evidence as the testimony of Sydney Smith was so inherently unreliable and contradictory that a verdict based on it amounts to no more than

surmise or conjecture and hence, to base a verdict on this identification shocks the conscience and the conviction cannot stand.

## FACTUAL HISTORY

A Non-Jury trial commenced on January 17, 2017 and concluded on January 20, 2017. The Commonwealth was represented by Assistant District Attorney Jonathan Fodi. The Defendant, Mr. Austin, was represented by Ralph Karsh, Esquire.

Prior to testimony, the Commonwealth placed a Stipulation on the record as to the cause and manner of death of the victim Derrick Owens via a report from the County of Allegheny Medical Examiner's Office, at Case No. 15CORO3389. On April 25, 2015, the victim Derrick Owens was examined by Dr. Kenneth Howard Clark, associate medical examiner. **TT, Vol. I, at p. 8, l. 13-21.** The opinion of the associate medical examiner was that Derrick Owens, a 30 year old African American male, died as a result of a gunshot wound to the trunk. **Id. at p. 8, l. 22 through p. 9, l. 1.** The final pathological diagnosis was a penetrating gunshot wound of the right upper arm, reentry into the right upper lateral chest. **Id. at p. 9, l. 2-7.** The manner of death was ruled a homicide. **Id. at p. 10, l. 5-10.** The shooting of Derrick

4

Owens occurred on the evening of April 24, 2015, when it was dark. **Id. at p. 24, l. 23 through p. 25, l. 5.**

The Commonwealth's first witness was Detective Judd Emery. Detective Emery had been employed by the City of Pittsburgh Police for 16 years. **Id. at p. 10, l. 24 through p. 11, l. 8.** He was assigned to the violent crimes unit, homicide office, and was working in that capacity at the time of this homicide in April of 2015. **Id.** Detective Emery was assigned to investigate the death of Derrick Owens. **Id at p. 11, l. 9-13.** He arrived at the scene with his partner, Detective Bolin, and observed Mr. Owens lying in the driver's side area of a white SUV in the 1300 block of Columbus Avenue. **Id. at p. 11, l. 14-19.** According to Detective Emery, this block is located in the Manchester area of the City of Pittsburgh. **Id. at p. 13, l.7-10.** The medics arrived shortly before Detective Emery and had already pronounced Mr. Owens deceased. **Id. at p. 11, l. 20-23.**

Detective Emery located a female, Sidney Smith, in the front passenger seat and two males in the backseat, Mark Kelly and a Mr. Williams (he was not 100% sure of the names of the male passengers). **Id. at p. 12, l. 12-17.** The detective was aware of a civilian in the neighborhood who was taking pictures, Christopher Litherland. **Id. at p. 12, l. 18-22.** The Mobile Crime Unit arrived at the scene and

Detective Emery directed them to take pictures and measurements. Id. at p. 13, l. 2-6.

Sidney Smith was called as a witness on behalf of the Commonwealth. She recalled on April 24, 2015 being with Derrick Owens. **TT, Vol. II, dated January 18, 2017, at p. 4, l. 2-8.** Ms. Smith had only known him for a few months, but she liked him, and thought he was her boyfriend. **Id. at p. 4, l. 9-14 & p. 6, l. 7-13.** However, after the shooting, she found out he was married. **Id.** On that evening, at approximately 8 or 9 p.m., she was with Derrick and two of his friends parked on Columbus Street. **Id. at p. 4, l. 15 through p. 6, l. 1.**

Ms. Smith stated "We were driving around and we stopped at Shamrock on Western Avenue and me and him [victim Derrick Owens] grabbed a 40 ounce....of Olde English. It's a beer." **Id. at p. 6, l. 14-23.** Ms. Smith further testified "We just got one to share....I took a couple of sips before everything happened." **Id. at p. 7, l. 6-14.** Ms. Smith did not remember the back seat occupant rolling blunts, "but she wasn't getting high, I don't get high." **Id. at p. 23, l. 9-16.**

While Ms. Smith was in the passenger seat, with victim Derrick Owens in the driver's seat and Mr. Owens' two friends in the back seat; Mr. Owens got out of

the vehicle to stretch. **Id. at p.7, l. 15 through p. 8, l. 24.** As Mr. Owens got out, the driver door remained open and he was talking to all of the people in the vehicle. **Id.**

According to Ms. Smith, a gentleman walked up toward the car and she identified the Defendant, in the Courtroom, as the individual she saw walking up that night. **Id. at p. 8, l. 2-16.** She indicated the shooter walked up very smooth and calm. **Id. at p. 11, l. 1-11.** She observed him pull out a silver gun and point it at Mr. Owen's left side and shoot him twice. **Id.** Mr. Owens then yelled that he was shot and he fell into the car. **Id. at p. 11, l. 12-24.** At first, Ms. Smith thought it was a joke but locked her eyes with the shooter then saw him walk away like a "smooth criminal". **Id.** Mr. Owen's whole upper body fell into her lap and she observed blood coming out of his mouth. **Id. at p. 11, l. 25 through p. 12, l. 8.** When Ms. Smith locked eyes with the shooter, he was close to her. **Id. at p. 12, l. 13-17.** Ms. Smith was able to describe that the shooter was wearing a light tan letterman jacket with sport patches. **Id. at p. 13, l. 6-11.** She called 911 and waited for the police to arrive. **Id. at p. 14, l. 1-12.** The shooter walked towards the back of the vehicle and the two people in the car ran away. **Id.**

When the police arrived, she told them that someone came toward the truck and shot Mr. Owens. **Id. at p. 14, l. 16-24.** She told the police if she saw the shooter

7

again she could identify him. Id. at p. 16, l. 2-7. The night of the shooting, the police officers took her to headquarters and showed her a photo array. Id. at p. 16, l. 11 through p. 17, l. 7. It took Ms. Smith some time, but she eventually circled a photograph. Id. at p. 17, l. 8-23. She told the officers she wasn't real sure if that person was the shooter. Id. A few days later, on May 28, the police brought Ms. Smith back in to look at a second photo array. Id. at p. 17, l. 24 through p. 19, l. 16. She looked at the second array for approximately 10 minutes; selected and circled an individual on the array; signed and initialed her pick; and told the officers she was very positive this individual was the shooter. Id. She once again identified the Defendant, in the Courtroom, as the shooter she observed that night. Id. at p. 19, l. 17 through p. 20, l. 6.

On cross-examination, she denied that the shooter wore a hoodie and again stated that the shooter was wearing a light tan letterman jacket. Id. at p. 26, l. 1-12. She also testified that the shooter was clean shaven. Id. at p. 31, l. 3 through p. 32, l. 22. On cross-examination, the following exchange with Ms. Smith occurred:

8

BY MR. KARSH:

Q.     If Mr. Austin had a beard, just like he has now, on the night of the shooting, he couldn't have been the shooter, right?

A.  . That is true. But he wasn't caught that night.

Id. at p. 32, l. 14-22.

When questioned about whether it was dark on the street, Ms. Smith responded "But I do recall it being bright enough that I can see." Id. At p. 27, l. 16 through p. 28. L. 15. Ms. Smith further testified on cross-examination that she was approximately five feet from the shooter when he came upon the victim and she did not see any tattoos on him. Id. at p. 36, l. 5 through p. 37, l. 5.

Regarding the identification of the Defendant pursuant to the photo arrays, Commonwealth Exhibit 16 was the first photo Sidney Smith circled on the evening of the shooting. Id. at p. 16, l. 11 through p. 17, l. 23. While she circled a photograph, she told the detective, "I wasn't real sure". Id. The circled photograph, Commonwealth Exhibit 16, was identified as a photo of Mandol Ruggs by Detective Emery. TT, Vol. I, p. 33, l. 23 through p. 34, l. 7. Commonwealth Exhibit 17 was the photo array shown to Sidney Smith on April 28, 2015 at which time she circled the photo of the Defendant, Rashawn Austin, as the shooter. TT, Vol. II, p. 18, l. 5 through p. 20, l. 8.

9

Detective Emery testified the procedures of the Pittsburgh Bureau of Police, for photo array presentation utilize a double blind procedure. **TT, Vol. I, at p. 39, l. 23 through p. 40, l. 15.** Because of his knowledge of the investigation, he will develop a suspect. **Id.** Either he or his partner will develop a photo array. **Id.** The photo array will be shown to the witness by an officer not involved in the investigation so as not to contaminate or taint the photo array. **Id.** On cross-examination, Detective Emery testified the first photo array, Commonwealth Exhibit 16, was shown by Detective Schanck while Commonwealth Exhibit 17 was presented by Detective Hanlon. **Id. at p. 41, l. 15 through p. 43, l. 10.** Neither Detective Schanck nor Detective Hanlon had any involvement in the investigation. **Id.**

On cross-examination, Attorney Karsh showed Detective Emery Commonwealth's Exhibit 16 containing the photo of Mandol Ruggs. **Id. at p. 33, l. 23 through p. 35, l. 14.** Detective Emery agreed Mandol Ruggs is a light skinned African-American male and Attorney Karsh's client, Defendant Austin, is medium toned if not dark toned. **Id.** Detective Emery took exception with Attorney Karsh's conclusion, "Is it fair to say these guys don't look alike?" Detective Emery stated "they both have full faces.....Yes. They both look alike. Obviously they have a different skin tone. " **Id.**

Detective Emery obtained an arrest warrant for Defendant, Rashawn Austin, based upon the identification by Sydney Smith and his investigation. TT, Vol. I, January 17, 2017, p. 21, l. 17-21, p. 22, l. 18-24 & p. 24, l. 3-12. After obtaining the Arrest Warrant, Detective Emery spoke with Traylon Austin at her residence in the 3800 block of California Avenue. Id. at p. 22, l. 4-24. Detective Emery went to the residence of Traylon Austin looking for Defendant Rashawn Austin. Id. Eventually, with the assistance of the Fugitive Task Force, Detective Emery found Defendant Austin in Room 441 of the In Town Suites on May 7, 2015. Id. at p. 21, l. 2 through p. 22, l. 3. Detective Emery obtained a search warrant to search the hotel room. Id. Defendant Austin was alone in the hotel room. Id. A cell phone was found on the Defendant's person and a second cell phone was recovered from the hotel room Id. Defendant Austin told Detective Emery he had been staying at the In Towne Suites (Hotel) for a month. Id. at p. 30, l. 13 through p. 31, l. 20.

On redirect, Detective Emery indicated he obtained a search warrant for each of the two phones: the one found in the hotel room and the one on Mr. Austin. Id. at p. 40, l. 16 through p. 41, l. 9. Detective Emery turned the phones over to the computer crimes detectives to perform a forensic download. Id. The detective also obtained court orders to send to the cell phone providers to retrieve the cell phone

records, including the dates and times of calls and texts, as well as the cell towers used. **Id.**

As part of the investigation, Detective Emery also had the opportunity to determine that Mr. Austin did not have a license to carry a firearm and that he was a person not to possess a firearm. **Id. at p. 22, l. 25 through p. 24, l. 1.** Attorney Karsh stipulated that his client did not have a license and was a person not to possess a firearm. **Id.**

A Stipulation was entered between the Commonwealth and Defense Counsel that: "on approximately July 21, 2014, an investigation was initiated for a theft perpetrated by Derrick Owens, the deceased in this case." **Id. at p. 44, l. 13 through p. 45, l. 16.** Officer Dulski, City of Pittsburgh Police Department, applied for an arrest warrant for Derrick Owens, alleging that Mr. Owens committed the crimes of theft and access device fraud with the victim being Traylon Austin, 3613 California Avenue, No. 1, Pittsburgh, PA 15212. **Id.** Mr. Owens was charged with stealing approximately $895 from a SSI card that was located in the mailbox and that had been stolen. **Id.**

The Commonwealth called Christopher Litherland to testify. Mr. Litherland had resided in Allegheny County for approximately four years. **Id. at p. 46, l. 9-12.**

12

Mr. Litherland was a photographer and worked with people of special needs. **Id. p. at 46, l. 13-15.** On the evening of April 24, 2015, at approximately 9:00 p.m., Mr. Litherland was sitting in his car in the Manchester neighborhood of the City trying to photograph an abandoned house across the street, but his view was blocked by an SUV parked in front of said house. **Id. at p. 46, l. 16 through p. 47, l. 19.** He observed that the "guy or whoever got shot" was standing outside the car talking to a woman inside the car. **Id. at p. 48, l. 10 through p. 49, l. 16.** Mr. Litherland next observed the shooter walking slowly up the sidewalk on Fulton Street and turn onto the left hand side of Columbus. **Id. at p. 51, l. 21 through p. 52, l. 20.** The shooter turned and pulled his hand out of his pocket with a gun and shot the victim right in the chest. **Id.** He then watched two men get out of the backseat of the SUV and run away in the opposite direction of the shooter, while the shooter slowly walked down the side of the street after the shooting had occurred. **Id. at p. 52, l. 9 through p. 53, l. 24.**

Mr. Litherland then put his car in reverse and drove to the next block over to wait for the police to show. **Id. at p. 53, l. 25 through p. 54, l. 19.** After the police arrived, he gave them the same description of events. When asked if he had a chance to see the shooter, he responded: "No. I could not see his face. He was wearing a hoodie, a gray hoodie with stripes on it and kind of darker pants. That is

13

all I saw." Id. He could tell the shooter was a male and approximate height was 5'9". Id. at p. 54, l. 16 through p. 55, l. 18.

During cross-examination, Mr. Litherland recalled that the color of the hand of the shooter was black. **Id. at p. 61, l. 21 through p. 62, l. 7.** He could tell the shooter was black from his face also. **Id. at p. 69, l. 2-25.** The Court questioned Mr. Litherland as to whether the police asked him if he could identify anybody if they showed him a photo array to which he responded, no because he had a hoodie on. Id at p. 70, l. 3-25.

A stipulation was reached that Commonwealth Exhibit 18, obtained pursuant to the search warrants executed by the Pittsburgh Bureau of Police, contains cell phone records obtained from providers T-Mobile and AT&T for cell phone numbers 412-733-8717 and 412-315-5195, respectively. **Id. at p. 59, l. 23 through p. 61, l. 17.** It was stipulated the records were kept in the regular course of business as authentic business records of those providers. **Id.** Mr. Karsh further added it was his understanding that the records provided contain no substance of any calls, merely the calls or texts going out, the time they went out and where they have been. **Id. at p. 61, l. 3-10.** There was no dispute the two cell phones were the phones seized on May 7, 2015, from Defendant Austin. **Id. at p. 108, l. 11-13.**

14

Detective Lyle Graber was examined and testified regarding the cell phone records for the two cell phones. Id. at p. 61, l. 19 through p. 112, l. 5. After extensive voir dire, Detective Graber was offered as an expert in analysis of cellular telephone records and mapping of cell site data. Id. at p. 68, l. 17-21 and p. 74, l. 3-8. Once Detective Graber received the information contained in Commonwealth's Exhibit 18, he prepared a report and power point. Id. at p. 75, l. 11 through p. 76, l. 14. Commonwealth's Exhibit 19 is the power point prepared by Detective Graber. Id. at p. 76, l. 7-14. During Detective Graber's testimony, the slides which were contained in Commonwealth Exhibit 19 were marked Commonwealth Exhibits 20 through 52. Id. at p. 100, l. 22 through p. 101, l. 20. The Court admitted Commonwealth Exhibits 19 through 52. Id. at p. 111, l. 16-24.

Essentially, Detective Graber explained a cell phone communicates with a cell tower or cell site. Id. at p. 70, l. 1 through p. 72, l. 1. A cell tower is divided into three sections with each section having its own antenna covering approximately 120 degrees, comprising 360 degrees for the three sections. Id. For a call to be ongoing, the cellphone has to interact or communicate with a cell tower/site. Id. When the cellphone is moving or the user is traveling using the cell phone, different cell towers/sites will be utilized. Id. As the cellphone is moving, the system is

15

engineered to hand off the call to the next cell tower/site that has the strongest signal. **Id.**

Detective Graber analyzed the cell detail records for the two cellphones, one of which was on Defendant Austin's person and the other in the hotel room occupied solely by Defendant Austin. Detective Graber explained the Cellular Call Detail Records (CDR) contain basic information such as, the target number, i.e. the number in question, date, time, the duration of the call, the number called or calling the target number and the direction of the call. **Id. at p. 76, l. 15 through p. 77, l. 4 and Commonwealth Exhibit 21.** Direction of the call means whether it is an outgoing call from the target number or an incoming call to the target number. **Id. at p. 77, l. 5-8.** The CDR may also contain cell site information which includes identification of cell site and/or sites through which the communication is routed, cell site identifiers, location of cell site by latitude, longitude or closest address and the cell sector azimuth. **Id. at p. 77, l. 9 through p. 78, l. 7 and Commonwealth Exhibit 22.**

Detective Graber testified the one phone number was a Metro PCS telephone number serviced by the T-Mobile network while the other phone

number was a Tracfone wireless serviced by the AT&T network. Id. at p. 78, l. 8 through p. 79, l. 3 and Commonwealth Exhibit 25.

Detective Graber testified the time of a call becomes important in light of the time of the homicide at or around 9:00 p.m. on April 24, 2015. Id. at p. 80, l. 18 through p. 81, l. 9. Detective Graber identified a call from the Tracfone serviced by the AT&T network at 9:00 p.m. on April 24, 2015. Id. at p. 81. With regard to the 9:00 p.m. call on April 24, 2015, the records establish the cell site utilized, the physical location of the cell site designated by latitude and longitude and the sector of the cell tower used for the communication. Id. at p. 82, l. 4 through p. 83, l. 16 and Commonwealth Exhibits 29 through 35. Similar information for the T-Mobile cellphone provided the cell site and location for a specific call. Id. at p. 83, l. 17 through p. 85, l. 8 and Commonwealth Exhibits 36 through 39. The only difference in the records is that the T-Mobile records do not provide the azimuth information which prevents determining which of the three sectors on the cell tower the cell utilized. Id. at p. 84, l.22 through p. 85, l. 8.

Detective Graber testified about cell site mapping. As the homicide occurred on April 24, 2015 at approximately 9:00 p.m., Detective Graber tracked the cell phones for the period of one hour before the homicide and one hour after the

17

homicide, a time range between 8:00 p.m. and 10:00 p.m. **Id. at p. 85, l. 9-21 and**

**Commonwealth Exhibits 40 through 52.** In addition, Detective Graber also tracked

the site of the homicide --1307 Columbus Avenue, Pittsburgh, PA 15233, as well as

the hotel in the North Hills where Defendant Austin was arrested -- 4595 McKnight

Road, Pittsburgh, PA 15237. **Id. at p. 86, l. 9 through p. 87, l. 11.**

The first call tracked was at 8:08 p.m. It was an incoming call to the T-Mobile

phone. **Id. at p. 87, l. 13 through p. 88, l. 21.** The cell site utilized for the call was

north of the city and shooting site, and just south of the 4549 McKnight Road

address for the motel. **Id. and Commonwealth Exhibit 42.** The next three calls were

outgoing calls between 8:10 p.m. and 8:36 p.m. for the T-Mobile phone. **Id. at p.**

**90, l. 11 through p. 91, l. 3 and Commonwealth Exhibit 43.** The cell sites utilized

for these calls were south of the initial cell sites moving in a direction towards the

city. **Id.** Two additional calls were identified between 8:41 p.m. and 8:44 p.m. --

one call incoming and the other outgoing from the T-Mobile cell. **Id. at p. 91, l.4**

**through p. 92, l. 19 and Commonwealth Exhibit 44.** Again, for these calls the cell

site was in or around the City of Pittsburgh Downtown/Northside/West area. **Id.**

At 8:57 p.m., very close to the time of the homicide, there was an outgoing

call from the T-Mobile phone indicating a cell site in or around the City of Pittsburgh

18

Downtown Northside/West area in close proximity to the shooting site of 1307 Columbus Avenue, Pittsburgh, PA 15233. Id. at p. 91, l. 13 through p. 92, l. 19 and **Commonwealth Exhibit 45.**

Detective Graber testified at 9:00 p.m. there was both an incoming call to the T-Mobile phone and an incoming text to the phone utilizing the AT&T cell network. **Id. at p. 92, l. 21 through p. 93, l. 20 and Commonwealth Exhibit 46.** This again shows cell site usage in close proximity to the address of the homicide. **Id.** Detective Graber tracked the 8:57 p.m. T-Mobile outgoing call and the 9:00 p.m. AT&T incoming call to the cell site in close proximity to the address of the shooting. **Id. at p. 93, l. 21 through p. 96, l. 8 and Commonwealth Exhibit 47.**

In response to the Court's questioning, Detective Graber indicated that the two phones could have been utilized by one person with each phone utilizing a different cell site in close proximity. **Id. at p. 95, l. 22 through p. 96, l. 8.**

Shortly after the shooting occurred in the area of 1307 Columbus Avenue, Detective Graber testified there was an outgoing call from the T-Mobile phone. **Id. at p. 96, l. 10 through p. 97, l. 1 and Commonwealth Exhibit 48.** Pursuant to cell site mapping, cell towers north of the City were utilized for the call. **Id.** The final three calls were for the T-Mobile phone between 9:52 p.m. and 9:54 p.m., one an

19

incoming call and two outgoing calls. **Id. at p. 97, l. 3-8 and Commonwealth Exhibit 49.** Again, mapping depicted cell sites utilized north of the City of Pittsburgh in or around the area of the motel at 4595 McKnight Road, Pittsburgh, PA 15237 -- the site of Defendant Austin's arrest. **Id.**

After the Court denied Defendant's Motion for Judgment of Acquittal, Attorney Karsh offered Defendant Exhibits A and B. The Exhibits were admitted. **Id. at p. 114, l. 25 through p. 116, l. 16.** Defendant's Exhibit A is a photograph of the Defendant taken at the time of intake at the Allegheny County Jail on August 27, 2014. **Id. at p. 115, l. 3-10.** Defendant's Exhibit B is a photograph of the Defendant on the date of his arrest on May 8, 2015 upon intake at the Allegheny County Jail. **Id. at p. 115, l. 11-14 & l. 20-21, p. 116, l.10-14.** Both photos depict the Defendant with a full beard as stated by Attorney Karsh. **Id. at p. 115, l. 14-15.**

In addition, Jazmen Washington was called as a defense witness. Ms. Washington testified that she had known the Defendant for eight years. The Defendant is the father of her child. **Id. at p. 117, l. 16 through p. 118, l. 3.** She stated that for as long as she had known the Defendant, he has always had a beard. **Id.**

Defendant introduced an undated photograph of the Defendant holding his daughter. **Defendant's Exhibit C.** In the photo, the Defendant has a beard and Ms. Washington believed that the photo was taken in February 2015. **Id. at p. 118, l. 4-20 and p. 120, l. 9-19.** From January until the beginning of May of 2015, Ms. Washington testified that on the occasions when she saw the Defendant, he always had a beard. **Id. at 118, l. 4 through p. 119, l. 16.** She indicated that sometimes the Defendant stayed with her in the West End of Pittsburgh and other times he stayed at the InTown Suites, a hotel on McKnight Road. **Id. at p. 119, l. 17 through p. 120, l. 3.**

On cross-examination, Ms. Washington admitted that there were times she didn't see the Defendant for a couple of weeks and was not aware of his whereabouts. **Id. at p. 121, l. 5 through p. 122, l. 18.** Ms. Washington stated when asked about the frequency of sightings, she replied: "No. I see him sometimes. Then I don't. See him sometimes. Then I don't." **Id. at p. 121, l. 11-21.**

## DISCUSSION

### Statement of Errors on Appeal – Issue A

Defendant's first alleged error on appeal is that the trial court erred in finding Defendant guilty of Homicide in the Third Degree asserting that the Commonwealth presented insufficient evidence to sustain the verdict. Defendant

21

particularly claims as his basis the unreliable testimony of Sydney Smith; the alleged contradictory nature of her testimony with the testimony of Mr. Litherland; the absence of physical evidence linking Defendant to the crime -- that a recovered cell phone was not in Defendant's name nor was the hotel room in which the cell phone was located was not in Defendant's name; and that there was no motive. These contentions are without merit.

The Superior Court has articulated the standard of review when an appeal questions the sufficiency of the evidence. The Court must view all evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, and must determine if the evidence is sufficient to allow the fact-finder to conclude that every element of the crime has been established beyond a reasonable doubt. *Commonwealth v. Hartie*, 894 A.2d 800, 803-04 (Pa. Super. 2006). Upon review, the Court may not substitute its judgment for that of the fact-finder; "if the record contains support for the convictions, they may not be disturbed." *Id*. at 804.

Defendant argues that the evidence cannot support his conviction of murder in the third degree because Sydney Smith was not a credible witness. Defendant alleges that Ms. Smith's identification evidence was inherently unreliable; that she

22

had been drinking an alcoholic beverage on the night of the incident; that her preliminary hearing testimony differed substantially from her trial testimony in that she originally testified that the shooter was beardless and had no tattoos; that she selected a different person in the first photo array; and that her testimony contradicted the testimony of Mr. Litherland as to the clothing and actions of the victim and shooter. Likewise, Defense counsel argues that there was no physical evidence linking Mr. Austin to the crime. Defendant asserts that the recovered cell phone was not in his name; that the hotel room where the cell phone was recovered was not in his name; and that there was no motive established.

When determining sufficiency of the evidence, "[t]he facts and circumstances established by the Commonwealth 'need not be absolutely incompatible with a defendant's innocence, but the question of any doubt is for the [fact-finder] unless evidence be so weak and inconclusive that as a matter of law no probability can be drawn from the combined circumstances.'" *Commonwealth v. Hardcastle*, 546 A.2d 1101, 1105 (Pa. 1988), *quoting Commonwealth v. Sullivan*, 371 A.2d 468, 478 (Pa. Super. 1977). Further, the fact-finder may believe some, all or none of the evidence. *Hartie, supra*, 894 A.2d at 804.

23

Reviewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the testimony of the witnesses establish the sufficiency of the Commonwealth's case. The record, taken as a whole, establishes that the witnesses' testimony were not as contradictory as the Defendant would have us believe.

Taken as a part of the whole, Mr. Litherland testified that he saw the shooting. Although Mr. Litherland could not see the shooter's face because it was covered by a gray hoodie, **TT, Volume I, at p. 54, l. 22-24,** he could tell that the shooter was a male, approximately 5'9", **Id. at p. 55, l. 10,** and that the color of the shooter's hand was black. **Id. at p. 62, l. 5-16.** Mr. Litherland observed that the shooter was not running but was just walking slowly, **Id. at p. 52, l. 11-13,** when he [the shooter] turned and pulled a gun out of his pocket and shot him [the victim] right in the chest. **Id. at p. 52, l. 13-17.** Mr. Litherland heard one shot fired which was approximately 15 feet away. **Id. at p. 53, l. 2-3 and p. 55, l. 4-7.**

As another part of the entire record, Sydney Smith testified that she was with the victim and two of his friends sitting in a parked SUV on Columbus Street. **TT, Volume II, at p. 4, l. 15 through p. 5, l. 6.** While the victim Derrick Owens was standing outside the vehicle with the driver's door open, Ms. Smith observed a man

24

walk up to the vehicle in a very smooth and calm manner and pull out a silver gun, shooting the victim in the left side two times. **Id. at p. 11, l. 5-8.** Ms. Smith identified the man as the Defendant in the Courtroom. **Id. at p. 8, l. 6-11.** In furtherance of her identification, Ms. Smith had locked eyes with the shooter as he slowly walked away, and she indicated he was close to her. **Id. at 11.** She described the shooter as wearing a light tan letterman jacket with sport patches. **Id. at p. 13, l. 7-11.** Ms. Smith called 911, **Id. at p. 14, l. 2,** and upon speaking to police officers, she felt she could identify the shooter if she saw him again. **Id. at p. 16, l. 1-4.**

On the night of the shooting, police officers showed Ms. Smith a photo array and after a while, she circled a photo but told the officers she wasn't certain that he was the shooter. **Id. at 16, l. 11 through p.17, l. 23.** However, about four days later, the police brought her into headquarters to view a second photo array. **Id. at p. 18, l. 5-12.** This time, Ms. Smith selected and circled a photo, signed and initialed her pick, and told the officers she was very positive that this photo identified the shooter. **Id. at p. 19, l. 5-16.**

On cross-examination, Ms. Smith consistent with her preliminary hearing testimony, stated that the shooter was not wearing a hoodie, **Id. at p. 26, l. 7-8,**

and was clean shaven. **Id. at p. 30, l. 23 through p. 31, l. 31.** She did not contradict herself.

Regarding Defendant Austin's contention that Ms. Smith "had been drinking an alcoholic beverage" inferring that it may have affected her identification of the Defendant, there is absolutely no merit to this argument. As set forth in the Factual History section above, Ms. Smith had a couple of sips from a forty-ounce beer. Additionally, Ms. Smith did not smoke marijuana nor "get high". There is no evidence that Ms. Smith was impaired in any way, shape, or form.

Taking the record as whole, although Mr. Litherland testified he could not see the shooter's face because he recalled the shooter wearing a hoodie, it is noteworthy that he was parked across the street and was not nearly as close to the shooter as Ms. Smith. Ms. Smith was closer in proximity having "locked eyes" with the Defendant to make a more specific identification.

The Defendant asserts that the existence of his beard upon arrest is exculpatory. To the contrary, the shooting took place on April 24, 2015 and the Defendant, Rashawn Austin was not arrested until May 7, 2015. Notwithstanding Defendant's Exhibit B -- a May 8, 2015 Allegheny County Jail intake photograph of the Defendant with a beard, **Id. at p. 115, l. 11-21 and p. 116, l. 10-16,** -- there is

26

no doubt Defendant Austin could grow a beard in fourteen days from the date of the shooting on April 24, 2015 through May 8, 2015. This practical point was emphasized by the Commonwealth in closing argument. **Id. at p. 134, l. 6-15.**

Defendant seeks to bolster his misidentification defense by asserting that "she [Ms. Smith] originally testified that the shooter was beardless and did not have tattoos." However, Ms. Smith never stated the shooter "did not have tattoos". To be succinct, Ms. Smith stated that she "didn't see any tattoos." **Id. at p. 34, l. 12-14.** A fair reading of Ms. Smith's testimony on this matter leads one to conclude she was looking at the shooter's face, not his neck or elsewhere. **Id. at p. 32, l. 24 through p. 34, l. 14.** Moreover, the photographs introduced by Defendant Austin, Defendant's Exhibits A, B and C corroborate Ms. Smith's testimony that she did not see any tattoos on his face. In fact, the Defendant did not have a tattoo on his face. While Defendant's Exhibit A depicts a tattoo on Defendant Austin's neck area, there is no tattoo on his face. In addition, Defendant's Exhibit B and C do not visibly depict the neck tattoo because of the positioning of Defendant's head in the photographs.

Based upon the identification by Sydney Smith and his investigation, Detective Emery obtained an arrest warrant for Defendant, Rashawn Austin. TT,

27

Vol. I, January 17, 2017, p. 21, l. 17-21, p. 22, l. 18-24 & p. 24, l. 3-12. After obtaining the Arrest Warrant, Detective Emery spoke with Traylon Austin at her residence in the 3800 block of California Avenue. **Id. at p. 22, l. 4-24.** As a result, Detective Emery went to the residence of Traylon Austin looking for Defendant Rashawn Austin. **Id.** Eventually, with the assistance of the Fugitive Task Force, Detective Emery found Defendant Austin in Room 441 of the In Town Suites on May 7, 2015. **Id. at p. 21, l. 2 through p. 22, l. 3.** Detective Emery obtained a search warrant to search the hotel room. **Id.** Upon executing the warrant, Defendant Austin was located alone in the hotel room with a cell phone on his person, and a second cell phone was recovered from the same room **Id.**

Thereafter, Detective Emery obtained a search warrant for each of the two phones and turned the phones over to the computer crimes detectives to perform a forensic download. **Id at p. 40, l. 16 through p. 41, l. 9.** Detective Emery also obtained court orders to retrieve the cell phone records from the phone providers, including the dates and times of calls and texts, as well as the cell tower locations used. **Id.**

Taking the record as a whole, the Defendant's argument that there is no physical evidence linking Defendant Austin to the crime is fallacious. Defendant

Austin's argument disregards the existence of inculpatory physical evidence in conjunction with the powerful incriminating circumstantial evidence in the Commonwealth's favor.

Addressing first the cell phones, the only person at the In Towne Suites Hotel in room 441 was Defendant Austin on May 7, 2015 at the time of his arrest. **Id. at p. 21, l. 2 through p. 22, l. 3.** Admittedly, neither cell phone was registered to Defendant Austin. However, one phone was on his person and the other was in hotel room 441 -- which was <u>only</u> occupied by Defendant Austin. **Id.** Defendant Austin admitted he had been staying at the In Towne Suites Hotel for a month. **Id. at p. 30, l. 13 through p. 31, l. 20.** This Court draws the reasonable inference that Defendant Austin either directly possessed or constructively possessed both cell phones, any information on the cell phones, and the logistical data derived therefrom.

Detective Graber analyzed the cell detail records for the two cellphones, one of which was on Defendant Austin's person and the other in the hotel room occupied solely by Defendant Austin. Detective Graber explained the Cellular Call Detail Records (CDR) contain basic information such as, the target number, i.e. the number in question, date, time, the duration of the call, the number called or

calling the target number and the direction of the call. **Id. at p. 76, l. 15 through p. 77, l. 4 and Commonwealth Exhibit 21.**

Detective Graber testified about cell site mapping. The homicide occurred at approximately 9:00 p.m. on April 24, 2015, and Detective Graber tracked the cell phones for the period of one hour before the homicide and one hour after the homicide, a time range between 8:00 p.m. and 10:00 p.m. **Id. at p. 85, l. 9-21 and Commonwealth Exhibits 40 through 52.** Along with identifying the time of 9:00 p.m. on April 24, 2015, he also located 1307 Columbus Avenue, Pittsburgh, PA 15233 the site of the homicide, as well as the hotel in the North Hills where Defendant Austin was arrested, 4595 McKnight Road, Pittsburgh, PA 15237. **Id. at p. 86, l. 9 through p. 87, l. 11.**

As set forth in the cell phone analysis detailed in the Factual History above, the Commonwealth established three key pieces of physical circumstantial evidence. First, within the hour before the homicide, i.e. between 8:00 p.m. and 9:00 p.m., on April 24, 2015, the phones are in the vicinity of In Towne Suites and they were moving south toward the area of the homicide. Second, at the time of the homicide both phones are in close proximity to the area of the homicide. Finally, after the homicide occurs at a minimum the T-Mobile phone was tracked

moving north of the homicide scene toward the area of 4549 McKnight Road, Pittsburgh, PA 15237. Coincidentally, 4549 McKnight Road is the address for the In Towne Suites Hotel where Defendant Austin was residing on the date of the homicide by his own admission. Clearly, this is relevant circumstantial evidence tying Defendant Austin to the homicide.

A Stipulation was placed before the Court that on July 21, 2014, an investigation was initiated for a theft perpetrated by Derrick Owens (the victim herein) and he was charged with stealing approximately $895.00 from an SSI card located in the mailbox of victim, Traylon Austin. **TT, Vol. I, at p. 44, l. 13 through p. 45, l. 16.** The address identified for Traylon Austin was 3613 California Avenue, Pittsburgh, PA 15212. **Id.**

After Detective Emery obtained an arrest warrant for Defendant Rashawn Austin, he went to the residence of Traylon Austin looking for Defendant Rashawn Austin on California Avenue. **Id. at p. 22, l. 4-24.** Detective Emery spoke with Traylon Austin at her residence attempting to execute the arrest warrant for Defendant Rashawn Austin. Detective Emery stated, "At her residence on California Avenue. I don't know the exact. I believe in the 3800 block." **Id.**

31

Detective Emery was obviously referring to the address of Traylon Austin at 3613 California as stipulated by Attorney Karsh.

The Commonwealth did not establish the relationship, if any, between Defendant Rashawn Austin and Traylon Austin. However, the evidence did establish two important facts. Both individuals, Rashawn and Traylon possessed the identical last name – Austin. Detective Emery possessed information that Defendant Rashawn Austin either lived at the residence of Traylon Austin or, in the alternative, Traylon Austin possessed information as to the whereabouts of Defendant Rahawn Austin. Regardless of which inference is correct, the evidence establishes a link or connection between Defendant Rashawn Austin and Traylon Austin. This also established a link or connection between Defendant Rashawn Austin and the victim Derrick Owens. The relationship, link, and/or connection among Defendant Rashawn Austin, Traylon Austin, and victim Derrick Owens may be the motive for Defendant Rashawn Austin shooting and killing victim Derrick Ownens (i.e., victim Derrick Owens stole from Traylon Austin, a person associated in some manner with Defendant Rashawn Austin).

The record, taken as a whole, contains support for the convictions and should not be disturbed on appeal. This Court acted within its discretion in finding that the

32

evidence proved beyond a reasonable doubt that the Defendant was guilty of Murder in the Third Degree. In light of the nature of the shooting, the court could have convicted Defendant Austin of Murder in the First Degree since a general charge of Criminal Homicide was charged in the Information under 18 Pa. C.S.A. Section 2501(a). However, the court gave Defendant Austin the benefit of the doubt in light of where the bullet initially entered the decedent's right upper arm arguably a non- vital area of the body. **TT, Vol. II at p. 112, l. 12 through p. 113, l. 4 and p. 140, l. 8 through p. 141, l. 15 and Commonwealth Exhibit 53.**

## Statement of Errors on Appeal – Issue B

The Defendant's second alleged error on appeal is that the trial court reached a verdict that was contrary to the weight of the evidence in finding Mr. Austin guilty of Third Degree Murder due to the unreliable and contradictory testimony of Sydney Smith. A verdict based upon her testimony amounts to no more than surmise or conjecture. However, this assertion offers Defendant no greater refuge than his prior claim. The determination of whether a verdict is against the weight of the evidence is governed by the following standard:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its

judgment for that of the finder of fact. Thus, we may only reserve the lower court's verdict if it so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003).

With respect to a weight challenge based on the credibility of witness testimony, the Superior Court has held:

> When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review. Moreover, where the trial court has ruled on the weight claim below, an appellate court's rule is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court culpably abused its discretion in ruling on a weight claim.

*Commonwealth v. Trippert*, 932 A.2d 188, 198 (Pa. Super. 2007), *quoting* *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004).

Further, a challenge to the weight of the evidence concedes that sufficient evidence exists to sustain the verdict, but questions which evidence is to be believed. *Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa. Super. 2006). A new trial should not be granted because of a mere conflict in the testimony or because

34

the judge on the same facts would have arrived at a different conclusion. *Commonwealth v. Widmer*, 744 A.2d 745 (Pa. 2000). When a defendant claims that a verdict is against the weight of the evidence, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the other facts, is to deny justice. *Commonwealth v. Fisher*, 47 A.3d 155, 158 (Pa. Super. 2012) *appeal denied*, 62 A.3d 378 (Pa. 2013).

This Court's finding that Sydney Smith was a credible witness is supported by the evidence of record, as fully set forth above in Discussion A. Specifically, Ms. Smith identified the shooter based on the time when their eyes locked immediately after the shooting; she was very close to the shooter; and was able to see his face. The circumstantial evidence of the phones location at or near the time of the shooting corroborates the testimony of Sydney Smith. The verdict was not contrary to the weight of the evidence and the conviction should stand.

## CONCLUSION

Based on the foregoing, the judgment of sentence should be **AFFIRMED**.

**BY THE COURT:**

Date: 6/13/2018 _____, J.

PHILIP A. IGNELZI

36